Wayne Dillard CARVER, Plaintiff,

v.

KNOX COUNTY, TENNESSEE, et al.,
Defendants/Third–Party Plaintiffs,

v.

Ned McWHERTER, et al.,
Third–Party Defendants.

No. Civ. 3–86–299.

United States District Court,
E.D. Tennessee, N.D.

Jan. 25, 1989.

John E. Eldridge, Dean Rivkin, University of Tennessee Legal Clinic, Knoxville, Tenn., for plaintiff.

Richard T. Beeler, Knox County Law Director, Robert H. Watson, Sr., John Duffey, Knoxville, Tenn., for defendants/third-party plaintiffs.

David Himmelreich, Asst. Atty. Gen., Nashville, Tenn., for third-party defendants.

## MEMORANDUM OPINION

JARVIS, District Judge.

### I. PRELIMINARY AND BACKGROUND INFORMATION

This is a class action, certified as such under Rule 23(b)(2), Federal Rules of Civil Procedure, brought pursuant to 42 U.S.C. § 1983, on behalf of the following class of persons who seek declaratory and injunctive relief and, in some cases, monetary damages, concerning the conditions of confinement at the Knox County Jail:

> All persons who have been or are confined in the Knox County Jail, Knoxville, Tennessee, a sub-class consisting of present and future pre-trial detainees in said jail, and a sub-class consisting of all Tennessee Department of Correction sentenced inmates awaiting transfer to the penitentiary.

[*See* Doc. 103]. Generally, this class action seeks injunctive and declaratory relief to address "the deprivation, under color of State law, of the class's rights under the First, Fourth, Fifth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution." [*See* Doc. 104]. Specifically, this class action seeks "to eliminate overcrowding, unsanitary conditions, lack of adequate medical, dental and mental health care, lack of exercise and recreation opportunities and facilities, and living conditions which constitute a hazard to the class's mental health, as well as a serious danger to their personal safety." [*See id.*]. The court would also note that the class was granted leave to amend their complaint to add the issue of lack of access to a law library before trial. [*See* Doc. 121].

The defendants fall into two categories: (1) Knox County, Tennessee and its sheriff, Joe C. Fowler, ("county defendants"); and (2) the Governor of Tennessee and other state officials in their official capacities ("state defendants"). The county defendants have filed a third-party complaint against the state defendants in which they too seek declaratory and injunctive relief. Essentially, the county defendants contend that the failure of the State of Tennessee to receive inmates who were supposed to be in the State Department of Correction has resulted in the increasing number of prisoners located and housed in the Knox County facilities. [Doc. 16]. Thus, the county defendants contend that if any of plaintiffs' constitutional rights have been violated in the Knox County facilities, these violations are the proximate result of the state defendants' failure to meet their duties and responsibilities in reference to the state penal system. [*See id.*]. It is undisputed that the state-sentenced inmates are presently housed in the Knox County facilities (as well as in other counties' facilities) because of a federal court order issued by Judge Thomas A. Higgins in December, 1985. That order limited the number of inmates who could be accommodated in the Tennessee state prison system. Subsequently, the Tennessee Department of Correction ("TDOC") reduced the num-

ber of state-sentenced inmates to be received from all counties in Tennessee. According to undisputed statistics and testimony at the time of trial, approximately 2100 out of 7800 TDOC prisoners are incarcerated in local county jails. In Knox County at the time of trial, there are approximately 120 inmates who should be in the custody of the TDOC.

This matter was tried without intervention of a jury on August 10, 12 and 15, 1988 only as to the issue of the constitutionality of the conditions of confinement in the Knox County jail facilities. The issues regarding alleged damages and proposed injunctive relief were bifurcated by previous order of the court. [*See* Doc. 103]. After consideration of the pleadings, testimony and exhibits introduced at trial, the parties' briefs and applicable law, the court makes the following findings of fact and conclusions of law. Rule 52(a), Federal Rules of Civil Procedure.

## II. FINDINGS OF FACT

### A. *General*

Defendant Knox County, Tennessee operates three penal facilities: (1) the Knox County Jail ("Jail"), which is the main facility located in the basement area of the City–County Building in Knoxville, Tennessee; (2) the Knox County Jail Intake Center ("Intake Center"), which is located in the Knoxville Safety Building; and (3) the Knox County Jail Annex ("Annex"), which is part of the Knox County Penal Farm located on Maloneyville Road in Knox County, Tennessee, specifically consisting of four cell blocks, which the Knox County Sheriff's Department leases from the County Highway Department. It is important to note that the state-sentenced inmates are housed at all three facilities.

### B. *Physical Description*

#### 1. *The Jail*

At the time the Jail was completed in 1979, it complied with all guidelines required by the State of Tennessee. [*See* Trial Exh. 10]. Because the Jail is designed as a short term holding facility, *i.e.*, for holding inmates for one year or less, it does not offer outside space for recreation or exercise because proper security cannot be maintained. [*See id.*]. The Jail has thirteen separate living units, commonly referred to as "tanks", as well as an additional holding cell. [*See* Trial Exhibit 1]. One of the tanks is supposed to be exclusively for female inmates; another tank is supposed to be exclusively for mentally unstable inmates; and another tank is supposed to be exclusively for drunk inmates. Most of the tanks have beds for 20 inmates. A typical 20–person tank has 10 two-person small cells in which the inmates sleep. These individual cells have two bunks, a sink and toilet. These two-person cells then open up into a corridor or hallway which, in turn, leads to a larger day room, which is approximately 24 feet by 36 feet. While in the day room, inmates have access to two toilets and two showers. The dayroom also offers a television set, a telephone, and five steel tables with four built-in steel seats around each table. As noted earlier, since there is no access to the outdoors for recreation and indoor recreation is very limited, the tables provide one of the few areas for recreation, primarily in the form of card games. The day room is open from 6:00 a.m. until 11:00 p.m.; therefore, it is the area in which most inmates spend most of their time.

The drunk tank is a small cell approximately 20 feet by 27 feet. It is undisputed that the drunk tank was designed for the incarceration of intoxicated persons on a temporary basis, *i.e.*, 24 to 48 hours. There are no beds in the drunk tank since the Tennessee Corrections Institute ("TCI")[1] does not allow steel bunks in any drunk tank because of the potential for intoxicated inmates to injure themselves on them. The drunk tank offers three toilets, a shower and a bare concrete floor.

---

1. TCI is statutorily empowered, *inter alia,* to establish minimum standards for jails, lock-ups, workhouse and detention facilities, to inspect these facilities and to establish and enforce procedures to insure compliance with these standards. *Tennessee Code Annotated* § 41–4–140 (Supp.1988).

## 2. *The Intake Center*

The Intake Center was built in 1967 and is designed as a short-term intake center for processing and temporarily housing arrestees. The Intake Center has several sizes of cells, varying from providing three beds to 12 beds. Most of the cells are adjacent to a dayroom, which is open from 7:00 a.m. to 11:00 p.m. The dayroom areas for the Intake Center, however, are not as large as those in the Jail. Moreover, no cell at the Intake Center offers any place to sit other than on a bed. Although all of the cells have a sink and toilet, some of them do not provide showers. There are also no windows in this facility.

Also like the Jail, the Intake Center contains a drunk tank, which like the drunk tank at the Jail is a cell with a bare concrete floor. It also offers showers and toilets. Like the drunk tank at the Jail, it is only designed to accommodate intoxicated persons for short periods of time, *i.e.*, 24 to 48 hours.

## 3. *The Annex*

As noted earlier, the Annex consists of four cell blocks which the Knox County Sheriff leases from the County Highway Department. These cell blocks offer 20 beds each, arranged in dormitory fashion. The Annex offers showers and toilets in each cell. Unlike the other two facilities, the Annex offers two outside exercise areas. One of these provides a basketball goal and the other contains a horseshoe pit. Inmates at the Annex have access to these outdoor exercise areas for an hour and a half per day, five days per week, weather permitting.

## C. *Overcrowding*

### 1. *The Jail*

The Jail has a serious problem with overcrowding as a direct result of Judge Higgins' Order. As of January 6, 1988, the TCI-rated capacity [2] for the Jail was 212. [*See* Trial Exh. 24]. This maximum rated capacity is based on a minimum of 25 square feet of clear floor space per inmate according to the testimony of plaintiffs' expert witness, Gordon Kamka. The TCI-rated capacity was recalculated on July 6, 1988 and increased to 228 to include inmates who sleep in the Jail's laundry room. [*See* Trial Exh. 25]. Nevertheless, the credible evidence at trial indicates that the number of inmates has greatly exceeded 228 for extended periods of time.

TCI inspector Michael H. Jenkins inspected the Jail several times during the last two years. His July, 1986 inspection indicated that there were approximately 270 inmates at the Jail. Subsequently, Jenkins cited the Knox County Sheriff for being out of compliance with TCI standards, primarily due to this overcrowding, and notified him that he had until a specified date in August, 1986 to reduce the population. Jenkins then returned on that specified date and found that the Jail was in compliance with the rated capacity at that time of 212. Jenkins last inspected the Jail on July 6, 1988. [*See* Trial Exh. 25]. At that time, Jenkins did not recommend recertification since there were four areas of rule violations which needed to be corrected. [*See id.*]. Two of those rule violations concerned overcrowding. [*See id.*]. Jenkins further testified that he would reinspect the Jail on August 18, 1988 to observe whether the violations had been abated. The court finds that Jenkins' testimony is credible and supports the court's finding that the Jail is overcrowded.

Likewise, Captain Glen Neal, a shift supervisor for the Knox County Sheriff's Department, testified as to the increasing number of inmates at the Jail, which began immediately after Judge Higgins' Order two years ago. Captain Neal testified that the inmate population at the Jail has hovered between 260 to 270 for several two to three month periods during the last two years. In fact, the inmate population exceeded 300 for three or four days and even exceeded 312 on one occasion. As a direct result of this overcrowding, inmates are routinely forced to sleep on mattresses in

---

**2.** While failure to meet the Tennessee standards does not necessarily require a finding of consti-

tutionally impermissible conditions, it is relevant as a key factor for the court to consider.

the floor of both the drunk tank and the dayrooms for those extended periods of time. The court finds that Captain Neal's testimony is credible and further supports the court's finding that the Jail is overcrowded.

The court's finding of overcrowded conditions is also buttressed by reliable statistical evidence. The TDOC has been counting the population in all of the county jails since January, 1986. Although there was testimony before the court which indicates that this statistical information may not be completely accurate, the court finds that the TDOC census figures are substantially accurate, at least to the point of providing the court with reliable evidence that the Jail has been seriously overcrowded for extended periods of time. For example, the TDOC statistical summary reflects that 390 inmates were incarcerated in the Jail on October 17, 1986; that 404 inmates were incarcerated on April 10, 1987; that 342 inmates were incarcerated on October 23, 1987 (the original figure indicated 446 minus 104 which were incarcerated at the Intake Center); and as recently as April 4, 1988, that 275 inmates were incarcerated. [*See* Trial Exh. 16]. In short, all of these statistics reflect a number greatly in excess of the TCI-rated capacity of 228. It is also important to note in evaluating the statistical evidence after April, 1988, that Knox County transferred approximately 40 of the TDOC sentenced inmates to the Hancock County Jail in May, 1988 in order to temporarily alleviate the problems created by overcrowding at the Jail.

Of greater concern is the overcrowding demonstrated in the record with respect to the drunk tank at the Jail. The TCI-rated capacity for the drunk tank is only designed to hold intoxicated individuals for a short period of time, *i.e.*, 24 to 48 hours. There was ample credible testimony at trial that the drunk tank has regularly housed 30 to 50 persons for extended periods of time up to and exceeding one month. As explained earlier, there are no steel bunks

in the drunk tank because of the potential hazard they pose to intoxicated individuals. Therefore, inmates who are assigned to sleep there are provided a mattress to place on the concrete floor. The obvious overcrowding which results from housing 30 to 50 inmates in the Jail's drunk tank is exacerbated by the fact that two of the three available toilets do not always function. In fact, there was credible testimony that the two non-functioning toilets serve as additional locations on which two inmates sleep.[3] There was also credible testimony that the shower in the drunk tank sometimes leaks and consequently soaks the mattresses and sheets of the inmates who are sleeping in its floodplain. This problem occurs most frequently, according to Captain Neal, when the floor of the drunk tank is covered with "wall to wall" mattresses so that certain inmates have no choice except to locate their mattresses in the floodplain of the leaking shower. Captain Neal also testified that it was "not unusual" to see "wall to wall" mattresses on the floor of the drunk tank. During these times of serious overcrowding in the drunk tank, inmates sometimes have to share mattresses, thereby forcing them to sleep on their sides. Another disturbing aspect to housing a large number of inmates in the drunk tank is that when intoxicated persons are arrested, they are sometimes incarcerated in this tank with the sober inmates. For example, Captain Neal testified that he was aware that more than 80 persons were in the drunk tank on one occasion, although only for a few hours. Most of these inmates were sober. Captain Neal did point out, however, that Knox County Jail personnel utilize the holding area outside the jail area to house intoxicated persons until they are sober enough to be placed in the drunk tank.

Because of the overcrowded conditions at the Jail, many inmates must also sleep on the floor of the dayrooms. Like the inmates who sleep on the floor of the drunk

---

**3.** It needs to be emphasized that no inmate is forced to sleep on a toilet. Rather, certain inmates prefer to sleep on the non-functional toilets because they would not get stepped on as

would inmates who were sleeping on the floor; moreover, those inmates sleeping on the non-functioning toilets would also have quicker access to the functional toilet and the shower.

tank, these inmates are provided with a plastic-covered mattress and, in most cases, are issued a blanket, sheet and towel. However, there was credible testimony that during periods of gross overcrowding, inmates sometimes had to go several days without these latter basic necessities. It must also be emphasized that when an inmate has no other designated living area except for his mattress on the floor, he is forced by necessity to sit and eat on his mattress. Likewise, he is also reluctant to wander too far from his mattress since its underside serves as a repository for his personal effects, many of which are highly desired by other inmates. Several inmates testified that they slept on a mattress on the floor of a dayroom for several months. Captain Neal, however, testified that he was not aware of any inmates who were forced to sleep on a mattress in a dayroom more than a month unless they had volunteered to do so. Apparently, some inmates prefer to sleep on the floor of the dayroom as opposed to sleeping in a bunk in one of the cells because they have more room to walk about and they also have access to a telephone 24 hours a day. Nevertheless, the court finds that many inmates are forced to sleep on the floor of both the dayrooms and of the drunk tank for more than a month due to overcrowding.

## 2. *The Intake Center*

The testimony regarding the alleged overcrowding at the Intake Center indicates that this problem is not as serious as it is in the Jail. For example, plaintiffs' expert Kamka testified that the TCI-rated capacity of the Intake Center was 127. When Kamka made his inspection of all three Knox County facilities on March 29 and 30, 1988, he reported that there were only 115 inmates at the Intake Center. Thus, it was not overcrowded on the day of that inspection. The TCI-rated capacity for the drunk tank at the Intake Center is 16. On the day of his inspection, Kamka reported that the drunk tank was crowded, much like the drunk tank at the Jail. Inmate Charles Miller and plaintiff Wayne Dillard Carver both testified that inmates at the

Intake Center also had to sleep on the dayroom floor, just like inmates did at the Jail. They also testified that the jail personnel do not regulate who has a bed, but simply assign inmates to particular tanks. How that inmate receives a bunk is the responsibility of that particular inmate. Usually, the inmates establish a "pecking order" whereby an inmate with the most seniority on the floor will receive the first available bunk. That system, of course, does not always prevail due to personality conflicts. Moreover, if an inmate has a personality conflict with another inmate, he is then transferred to another cell. Once again, that inmate would be confronted with having to initially spend some time on the floor of that cell in order to build up seniority to later obtain a bunk.

Other credible testimony regarding the conditions of the Intake Center was from Elizabeth Catron, foreman of the Knox County Grand Jury for the November, 1987 term. Catron testified that the Knox County Grand Jury visited the Intake Center on February 2, 1988. At that time, the facility held 143 inmates (although it was her understanding that it was only built to accommodate 97). The court has also reviewed the Grand Jury report, which was signed by Catron and the other members of the Grand Jury. The court finds that report to be a credible description of the conditions as they existed at that time. [*See* Trial Exh. 12]. That report specifically noted that, "mattresses were on the floors and we saw some beds without mattresses." [*See id.*]. The court's conclusion that the Intake Center has been overcrowded on occasion is further supported by the TDOC jail census summaries. [*See* Trial Exh. 16]. These summaries, for example, indicate that on May 13, 1988 the Intake Center housed 154 prisoners. [*See id.*].

## 3. *The Annex*

The proof at trial indicates that there has been no problem with the Annex being overcrowded in the last couple of years. As previously discussed, the Knox County Sheriff leases four cell blocks of this facility, with each cell block offering 20 beds,

for a total of 80 beds. When Kamka inspected this facility on March 29 and 30, 1988, he noted that this facility was operating "at capacity." Moreover, he testified that it did not "bother him" for this facility to operate at capacity because of the available recreational facilities. Likewise, the Grand Jury report reflecting the Grand Jury's inspection on February 4, 1988 indicates that only 80 prisoners were being housed at the Annex. [*See* Trial Exh. 12].

### 4. *Cause of the Overcrowding*

The court finds that the presence of TDOC-sentenced inmates is the primary cause of the overcrowded conditions at the Jail and the Intake Center. All of the credible testimony indicates that the Knox County Jail System did not have a serious and continual problem with overcrowding until after Judge Higgins' order of December, 1985. In short, the court finds that if TDOC-sentenced inmates were removed from the Knox County Jail System, the problem with overcrowding (and all problems attendant to the overcrowding) would be alleviated immediately.[4] In fact, the court cannot envision a remedy for the problem of overcrowding without the removal of some or all of the TDOC-sentenced inmates. For example, proof at trial indicated that there were approximately 120 TDOC-sentenced inmates in the Knox County Jail facilities at the time of trial. Another example was from plaintiff's expert Kamka who testified that his inspection of the Knox County Jail on March 29 and 30, 1988 reflected 240 inmates, 168 of which were TDOC-sentenced inmates. These figures typify the extent of the overcrowding caused by the TDOC-sentenced inmates.

### D. *Violence*

#### 1. *The Jail*

Captain Neal testified that there has been an increase in violence by inmates not only against the guards but also against each other as a result of the overcrowding in the Jail after Judge Higgins' order. Before the overcrowding there was only an average of one attack by one inmate against another per week. It has now increased to one attack per day, although Captain Neal did qualify that statement by admitting that his definition of "attack" encompasses both physical violence and "altercation by words". An increase in violence is also reflected by the fact that Captain Neal is now sending two to three inmates a week to the hospital for examination after incidents of violence. Captain Neal has also had to call in "outside help," *i.e.*, street officers, to quell disturbances in the Jail as a result of this increased violence.

Captain Neal also testified that there has been an increase in escape attempts since the overcrowding. It is noteworthy that the shortage of necessities such as towels and sheets has provided an additional means by which family members and friends, under the guise of providing those necessities to inmates, can now smuggle in escape utensils such as hacksaw blades.

The increase of assaults on guards has increased the turnover of the guards. Specifically, Captain Neal testified that at least one half of the guards on the afternoon shift have less than one year's experience as a result of the high turnover. Similarly, Chief Jailer Carl Hill testified that there has been an increase in turnover of guards due to overcrowding. It is undisputed that the inexperience of neophyte guards limits their ability to cope with unusually challenging situations.

Plaintiffs further contend that persistent overcrowding exacerbates tension and stress among inmates, thereby directly contributing to increased violence. In that regard, Dr. Sundstrom testified that long-term confinement in close quarters was the most critical factor contributing to increased violence. He also noted that he was not as concerned about the crowded condition in the sleeping arrangements as he was with inadequate living space during

---

4. The Knox County defendants are to be commended for their good faith efforts in attempting to cope with the overcrowding caused by the presence of the TDOC-sentenced inmates within the limits of their available resources.

the day hours. In particular, he was of the opinion that 20 or more people in a relatively small area such as the day area would increase stress and tension.

In addition to an increase in violence as a result of the overcrowding, there was credible testimony at trial that some state sentenced inmates deliberately provoke altercations with other inmates in order to accelerate their departure date from the Jail. For example, Carver testified that he was sent to the penitentiary within two days of his sentencing due to his threats of violence. Captain Neal also admitted that inmates do provoke altercations in order to "get moved out" of the Jail. The court is obviously concerned with a climate in which inmates are tempted to engage in further acts of violence in order to escape the conditions of confinement at this facility.

As might be expected, violence also occurs in the drunk tank. For example, Inmate Jack Floyd Carter, who was incarcerated in the drunk tank in July, 1986, at a time when there were 40 to 60 others in there with him (and as many as 90 individuals during a "sting operation"), witnessed several robberies and a rape. However, Carter did admit on cross-examination that the rape he witnessed was of a known homosexual whose cries for help may not have been as vigorous as those of a heterosexual inmate under the same circumstances. Nevertheless, Carter testified that he did have personal knowledge of other inmates "calling out for help" because of violence; yet, no guards came to their relief.

The court further finds that the overcrowding has resulted in a break-down of the classification system which, in turn, has increased incidents of violence at the Jail. Captain Neal testified that Knox County Jail personnel formerly employed a classification system which would separate first offenders and even those who only required medium security from those requiring maximum security. Moreover, inmates with special medical needs, whether they be physical or mental, would be separated from the general population. Likewise, inmates under 21 years of age would be separated from older inmates. It almost goes without saying that the female inmates would be separated from the male inmates. Presently, Captain Neal testified that he could maintain the classification system "only to an extent". In fact, Captain Neal opined that once 85 to 90 percent of the capacity of a particular facility was exceeded, then a meaningful classification system would deteriorate. Similarly, Kamka testified that the Jail should only be operating at 80 to 90 percent capacity, not only to insure proper classification but also to provide adequate space for any "big busts" and for proper cleaning.

### 2. The Intake Center

Mike Mahoney, one of the defendants' expert witnesses, testified that there was a higher percentage of violence at the Intake Center than at the other two facilities. Mahoney related the increase in violence at this facility to the overcrowded conditions. Similarly, Mahoney noted that the drunk tank at the Intake Center, like the drunk tank at the Jail, was overcrowded and therefore conducive to an atmosphere of violent incidents.

### 3. The Annex

There was no credible proof offered during trial regarding the increase in any incidents of violence at the Annex.

### E. Sanitation and Ventilation

### 1. The Jail

In evaluating the overall sanitation at the Jail, the court would first note that there was ample proof presented at trial which indicates the ready availability of all necessary cleaning supplies for use by the inmates. These supplies include, *inter alia*, mops, brooms, toilet brushes, and cleaners. However, the proof also indicates that because of the overcrowded conditions at the Jail, it was difficult to move inmates from one cell to another in order to properly utilize these cleaning materials. As discussed earlier, nearly all of the expert testimony indicates that in order to properly clean the facility, the facility

should not be operated at more than 90% capacity. As the evidence has indicated, the Jail normally operates over 100% capacity. Thus, if the overcrowded conditions are eliminated, then the inmates and the trustees will be able to properly use the available cleaning materials. The court would point out, however, that there was no credible proof offered that the individual cells or the dayrooms were particularly filthy. Rather, the proof indicates that the cells just need to be cleaned on a more regular basis. Again, this could be accomplished if the overcrowded conditions are abated.

This factual finding as to the overall conditions at the Jail is not applicable, however, to the drunk tank. Plaintiffs' expert Kamka described the drunk tank as "filthy" and "dirty" and described the urinals as both "dirty" and "smelly". He also testified that there were cigarette butts on the floor and there did not appear to be any cleaning supplies available for the drunk tank. However, the court again finds that the primary problem with the drunk tank is the fact that 30 to 50 prisoners have been regularly housed there, and that often times two of the three toilets do not work. Even if adequate cleaning supplies were available, it would be impossible to utilize them when there is always a line to the one functioning toilet. However, there was no credible evidence that there is a lack of functioning plumbing, including toilets, sinks and showers, at any other location in the Jail. Only in the drunk tank does there seem to be a continuing problem with the condition and function of the toilets. Finally, it is important to emphasize that Kamka admitted on cross-examination that many of the problems with the overall sanitation at the Jail are directly caused by the inmates themselves. Again, the court is of the opinion that much of the tension and stress felt by the inmates and vented by throwing potatoes, urine, etc., on the floor is the result of the overcrowded conditions.

Another key element in evaluating the overall sanitation of this facility is whether inmates are promptly provided with necessary personal hygiene items such as toothbrushes, toothpaste, soap and razors, as well as towels, blankets, uniforms, and shoes. Plaintiffs' expert Kamka testified that he observed a lack of soap and toothpaste on his inspection. He also noticed one inmate without a shirt in the drunk tank. That inmate had been without one for three weeks. Additionally, there was credible evidence that inmates are not always promptly provided sheets, towels and blankets. Plaintiff Carver testified that when he was transferred to the Jail prior to trial, many of the other inmates did not have these basic necessities. Because he had suspected this shortage, Carver brought these necessities from Brushy Mountain. Likewise, Inmates Carter and L.A. Willis testified that they were not supplied with towels when they were first housed in the drunk tank at the Jail. Inmate Carter was not supplied with sheets. Of even more concern to the court is the testimony of Grand Jury Foreman Catron that the Jail was without toilet paper for the weekend of January 23–24, 1988. Her testimony on this issue was supported by the Grand Jury Report, [see Trial Exh. 12], and by the admission of Captain Quindry. However, Captain Quindry also testified that each inmate is provided with either a mattress or bed, blanket, two sheets, two uniforms, towel, washcloth, soap and a toothbrush. The court finds that there has been an occasional shortage of necessary personal hygiene items and that this shortage is directly related to the overcrowded conditions at the Jail.

Another component in evaluating the overall sanitation of the Jail is whether there is proper ventilation. The court finds no problem with the overall ventilation at the Jail except as it relates to the drunk tank. In that area, the court finds that a serious problem exists, but again finds that this problem is primarily related to the overcrowded conditions. Captain Neal testified that the ventilation was so poor in the drunk tank that his employees had to occasionally open two security doors in order to create air flow through the cell. Likewise, Inmate Carter testified that the air was "real bad" and that there was no

ventilation. He also emphasized that much of the difficulty with the air quality was because "everybody would light up a cigarette after a meal." Again, it does not take much imagination to envision the air quality when 30 to 50 people are smoking cigarettes in a 20 foot by 27 foot cell.

### 2. The Intake Center

There was no credible evidence offered at trial that there was a lack of available household cleaning materials such as mops, brooms, toilet brushes, cleansers, etc. There was, however, credible proof that there was an occasional shortage of such items as blankets, sheets and towels during times of serious overcrowding.

The major problem at the Intake Center with regard to sanitation is the lack of adequate ventilation. Grand Jury Foreman Catron described the conditions in the Intake Center on February 2, 1988, the day on which she and other members of the Grand Jury toured this facility, as "stifling". The Grand Jury report specifically stated as follows:

> ... We found the air stagnant and very hot on our visit February 2nd. We can only imagine how the summer months must be. In fact, one juror became ill and could not finish the tour.

[See Trial Exh. 12]. That report also described the ventilation system as well as the plumbing and lighting as being in a "sorry state." [See id.].

### 3. The Annex

There was no credible proof presented at trial regarding any particular problems with either sanitation or ventilation at the Annex.

### F. Meals

There was no credible evidence presented at trial which indicates that the three meals served at each of the three facilities were not adequate to support normal human health. The only testimony on this issue which was of some concern to the court was from Inmate Jack Carter regarding meals in the drunk tank at the Jail. Carter testified that some inmates were "too nerv-ous" to eat their meal because of the overcrowding. This occurred during a time when 40 to 60 inmates were housed in the drunk tank. Since the court has already ordered defendants to reduce the population of the drunk tank to 16, this particular problem should consequently be eliminated.

### G. Exercise and Recreation

#### 1. The Jail

Inmates at the Jail are not afforded any exercise programs or equipment. Inmates at the Jail do, however, fill up plastic garbage bags with water and place them in pillow cases—this is known as "pumping water". Of course, inmates can perform sit-ups or push-ups on the floor of the dayroom from 6:00 a.m. to 11:00 p.m. Nevertheless, during periods of overcrowding when the floor of the dayroom is occupied with other inmates and their mattresses, the inmates who wish to exercise in this manner are deprived of that opportunity. Moreover, inmates at the Jail have no access to fresh air and sunshine and certainly no opportunity to exercise in such an environment. This lack of any meaningful opportunity for exercise is more important when one considers that inmates are being incarcerated in overcrowded conditions in excess of one year. Dr. Sundstrom testified that exercise was a "good method of coping with stress" caused by overcrowded conditions.

Furthermore, there are no programs or activities provided for the prisoners. Likewise, there are no vocational or educational services provided. As a result, nearly all of the TDOC-sentenced inmates desire to leave this facility as soon as possible because they cannot receive "good time" or program credits during their incarceration. The primary recreational activities are either lying around watching television or playing cards. Additionally, some inmates are able to read and do so.

#### 2. The Intake Center

The court finds that the conditions at the Intake Center with regard to exercise are similar to those at the Jail. However, the lack of any meaningful opportunity for ex-

ercise at the Intake Center is exacerbated by the fact that the ventilation is much worse at the Intake Center and therefore provides an atmosphere even less conducive for indoor exercise than does the Jail.

### 3. The Annex

Because there are opportunities for outdoor exercise at the Annex, the court finds that there is no credible proof that there is any lack of meaningful opportunity to exercise. Likewise, because there is an outdoor basketball court and a horseshoe pit, there are also more opportunities for other recreational pursuits besides watching television and playing cards.

## H. Medical and Dental Services

### 1. The Jail

Captain Ken Quindry, who is with the Knox County Sheriff's Department, testified that three nurses are on duty at the Jail and that one nurse is on call 24 hours a day. Additionally, a physician visits the Jail four hours a day, four days a week to examine those inmates who have signed up on sick call. Captain Quindry also testified that if there were an emergency, medical or otherwise, a "panic button" is located in each cell block which an inmate could push for immediate assistance. There was also credible testimony that any time an inmate is injured, he would be taken immediately to a nearby local hospital. Plaintiff's expert Kamka testified that as long as there was adequate medical care available at a hospital, then there would be "no problem" for the inmates on this issue. Along these same lines, Inmate Jimmy Wayne Miller testified that he had "no complaints" regarding medical care at the Jail. He has seen the doctors "when necessary" and described the nurses as "very professional". In fact, he testified he was transported to see a "medical specialist on Kingston Pike" after one medical complaint. Likewise, Inmate Jack Floyd Carter testified that he had been transported to a local hospital "several" times and that he had "no complaints" regarding his treatment. Captain Neal also testified that he was not aware of any incident in which an inmate who needed immediate medical attention did not receive the necessary treatment. However, there was credible testimony that medication had occasionally been delivered to the wrong inmate, and that sometimes medical supplies were not timely delivered to the inmates. The court therefore finds that there is presently no serious problem with medical services at the Jail and, once the overcrowding is alleviated, there should be no problem whatsoever.

A dentist, Dr. Paul McGowan, is also available for the inmates two and half days a week and, on this schedule, is able to examine eight to ten inmates per week, primarily for toothaches and "grossly decayed teeth". Eighty to eighty-five percent of the inmates he examines require extractions, root canals and capping. Dr. McGowan further testified that most of the inmates he examines have taken poor care of their teeth and have rarely seen a dentist outside a jail. Therefore, the primary purpose of his dental program is to protect the general health of the inmates.

However, some inmates had general complaints regarding the dental care at the Jail. Inmate Charles Miller testified that he had made a request for dental care to the head nurse. In response, he was advised by her that he "needed to get in touch with his parents" because they must pay for it. In this case, Miller testified his parents could not afford it so he did not receive this dental treatment. Nevertheless, his testimony was unclear as to whether this treatment was necessary or just desirable. Of more concern to the court was the testimony of Inmate Maurice Eaddy, who stated that he had an abscessed tooth which was not treated at all during the 88 days he was in the Jail, even after he was "put on the list".

### 2. The Intake Center

Captain Quindry testified that there is one nurse on duty every day to handle complaints at the Intake Center, and that a nurse is on call 24 hours a day. As was the situation at the Jail, emergency medical care is provided by transporting an inmate to a nearby local hospital when necessary.

Similarly, emergency dental care is available to inmates who desire it through the Knox County Health Department.

### 3. The Annex

There was no credible testimony that any inmate did not receive proper medical and dental care at the Annex.

### I. Access to a Law Library

#### 1. The Jail

Captain Neal testified that there is no written policy regarding the inmates' use of the law library which is located on the main floor of the City–County Building. The present unwritten policy is that if an inmate requests a copy of a specific statute or case, then a detention officer will usually copy the requested material for that inmate. Moreover, one inmate has been allowed the privilege of being transported to and from that law library to work on his case.

Captain Neal's testimony was buttressed by that of plaintiff Carver, who testified that he had requested access to the law library but had been told he could not go there personally. Rather, Carver was advised that he had to know specifically what legal material he wanted so that a detention officer could obtain a copy of it for him. He also testified that he never received any of the legal material he had requested. It is important to note that Carver most needed access to the law library during the time between his preliminary hearing and his indictment, a time period which spanned several weeks during which he was not represented by counsel.

Finally, there was testimony that inmates had occasional difficulty in contacting their attorneys due to the paucity of telephones in the Jail; however, there was no testimony that any inmate had suffered any real prejudice as a result.

#### 2. The Intake Center

It is undisputed that there is no access to a law library at the Intake Center; however, there was no proof introduced regarding lack of access to the courts.

### 3. The Annex

Likewise, it is undisputed that there is no access to a law library at the Annex; however, there was no proof introduced regarding lack of access to the courts.

### III. CONCLUSIONS OF LAW

#### A. The Function of Constitutional Review

The court in *Dawson v. Kendrick,* 527 F.Supp. 1252 (S.D.W.Va.1981), has described well the somewhat limited function of federal courts in confronting issues raised by lawsuits contesting the conditions of confinement at particular prison facilities as follows:

The federal judiciary has traditionally followed a policy of substantial deference to those persons charged with the administration of state prisons and jails. This deference, frequently characterized as the "hands-off" policy, is premised upon notions of federalism and constitutes a recognition of the nonexpertise of the judiciary in the daily administration of a jail or prison. As stated in *Bounds v. Smith,* 430 U.S. 817, 832, 97 S.Ct. 1491, 1500, 52 L.Ed.2d 72 (1977), the federal courts do "not 'sit as co-administrators of state prisons.'"

The hands-off policy has not, however, been applied as an absolute in recent years. Beginning with the Supreme Court's decision in *Monroe v. Pape,* 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961), and *Cooper v. Pate,* 378 U.S. 546, 84 S.Ct. 1733, 12 L.Ed.2d 1030 (1964), it was established that constitutional deprivations occurring within the confines of a state prison or jail are actionable pursuant to 42 U.S.C. § 1983. The deference counseled by the hands-off policy has thus been merged with the federal courts' duty to address and, when appropriate, vindicate the constitutional rights of prisoners. This is reflected in Mr. Justice Renquist's admonition in *Procunier v. Martinez,* 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974), that:

[A] policy of judicial restraint cannot encompass any failure to take cognizance of valid constitutional claims whether arising in a federal or state institution. When a prison regulation or practice offends a fundamental constitutional guarantee, federal courts will discharge their duty to protect constitutional rights.

416 U.S. at 405–06, 94 S.Ct. at 1807–08 (additional citation omitted).

*Dawson*, 527 F.Supp. at 1280–81. In the instant case, in keeping with this court's limited role in this type of lawsuit, the court provided the parties ample opportunity before and during trial to resolve this matter. Specifically, the court wished to avoid encroaching upon the administrative authority of the officials of the Knox County Jail system. During the course of those discussions, the court was left with the firm impression that the State of Tennessee and its officials simply had no immediate options available in light of Judge Higgins' Order to alleviate the overcrowded conditions at the Jail caused primarily by housing state prisoners in these facilities. Thus, the court will now examine the appropriate constitutional standards and apply those standards to the facilities in question.

B. *Constitutional Standards*

1. *Convicted Inmates*

The Eighth Amendment to the United States Constitution imposes the constitutional limitation upon punishments in three words: they cannot be "cruel and unusual." *Rhodes v. Chapman*, 452 U.S. 337, 345, 101 S.Ct. 2392, 2398, 69 L.Ed.2d 59 (1981). It is unquestioned that "[c]onfinement in a prison ... is a form of punishment subject to scrutiny under the Eighth Amendment standards." *Hutto v. Finney*, 437 U.S. 678, 685, 98 S.Ct. 2565, 2570, 57 L.Ed.2d 522 (1978). No static test has been developed for determining violations of the Eighth Amendment; rather, the Supreme Court has interpreted the prohibition in the Eighth Amendment "in a flexible and dynamic manner," *Gregg v. Georgia*, 428 U.S. 153, 171, 96 S.Ct. 2909, 2924, 49 L.Ed.2d 859 (1976) (joint opinion),

and has extended the Eighth Amendment's reach beyond the barbarous physical punishments at issue in the courts' earliest cases. *See Wilkerson v. Utah*, 99 U.S. 130, 25 L.Ed. 345 (1879); *In re Kemmler*, 136 U.S. 436, 10 S.Ct. 930, 34 L.Ed. 519 (1890). In short, it is a settled principal of Eighth Amendment law that penal measures are constitutionally repugnant if incompatible with the "evolving standards of decency that mark the progress of a maturing society." *Trop v. Dulles*, 356 U.S. 86, 101, 78 S.Ct. 590, 598, 2 L.Ed.2d 630 (1958) (plurality opinion). The Court has also held that "Eighth Amendment judgments should neither be nor appear to be the 'subjective views' of judges, but should be 'informed by objective factors to the maximum possible extent.'" *Rummel v. Estelle*, 445 U.S. 263, 274–75, 100 S.Ct. 1133, 1139, 63 L.Ed.2d 382 (1980).

Thus, it has been held that a state's obligations under the Eighth Amendment have been met if it furnishes its prisoners with reasonably adequate food, clothing, shelter, sanitation, medical care and personal safety. *Newman v. Alabama*, 559 F.2d 283, 291 (5th Cir.1977), *remanded with instructions sub nom., Alabama v. Pugh*, 438 U.S. 781, 98 S.Ct. 3057, 57 L.Ed.2d 1114, *cert. denied sub nom.*, 438 U.S. 915, 98 S.Ct. 3144, 57 L.Ed.2d 1160 (1978). Similarly, the Sixth Circuit has held that "[t]here exists a fundamental difference between depriving a prisoner privileges he may enjoy and depriving him of the basic necessities of life. We think this is the minimal line separating cruel and unusual punishment from conduct that is not." *Cunningham v. Jones*, 567 F.2d 653, 656 (6th Cir.1977), quoting, *Finney v. Arkansas Board of Correction*, 505 F.2d 194, 208 (8th Cir.1974)). The ultimate question for the court is whether or not the conditions of confinement deprived inmates of the "minimal civilized measure of life's necessities." *Rhodes*, 452 U.S. at 347, 101 S.Ct. at 2399.

Finally, in evaluating the convicted inmates' Eighth Amendment claims, the court is mindful that the Sixth Circuit

Court of Appeals has recently rejected the "totality of the circumstances" test. *Groseclose v. Dutton*, 829 F.2d 581, 585 (6th Cir.1987); *Walker v. Mintzes*, 771 F.2d 920, 925–26 (6th Cir.1985). In other words, even though this court is required to consider all of the prison's conditions and circumstances in evaluating the sentenced inmates' Eighth Amendment claims, the court must find a specific condition on which to base an Eighth Amendment claim, *i.e.*, it must amount to a deprivation of "life's necessities." *Walker*, 771 F.2d at 925 (quoting *Rhodes v. Chapman*, 452 U.S. at 347, 101 S.Ct. at 2399).

### 2. Pretrial Detainees

■■■ A person charged with a crime may be detained in custody prior to trial to insure his availability for trial and, if convicted, for service of his sentence; however, punishment prior to a determination of guilt violates the pretrial detainee's right to due process of law under the Fourteenth Amendment. *Bell v. Wolfish*, 441 U.S. 520, 533–35, 99 S.Ct. 1861, 1870–72, 60 L.Ed.2d 447 (1979). In evaluating the constitutionality of conditions or restrictions of pretrial detention, "the proper inquiry is whether those conditions amount to punishment of the detainee." *Id.* at 535, 99 S.Ct. at 1872. To determine whether or not existing jail conditions constitute "punishment" of pretrial detainees, the Supreme Court has provided the following test:

> ... Absent a showing of an express intent to punish on the part of detention facility officials, that determination generally would turn on "whether an alternative purpose to which [the restriction] may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned [to it]." [Citation omitted]. Thus, if a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to "punishment". Conversely, if a restriction or condition is not reasonably related to a legitimate goal—if it is arbitrary or purposeless—a court permissibly may infer that the purpose of the

governmental action is punishment that may not constitutionally be inflicted upon detainees *qua* detainees. [Citation omitted]. The courts must be mindful that these inquiries spring from constitutional requirements and that judicial answers to them must reflect that fact rather than a court's idea of how best to operate a detention facility. [Citations omitted.]

*Bell v. Wolfish*, 441 U.S. at 538–39, 99 S.Ct. at 1873–74. Moreover, it is clear that conditions of confinement are not punitive simply because they interfere with a jail inmate's "understandable desire to live as comfortably as possible and with as little restraint as possible during confinement." *Id.* at 537, 99 S.Ct. at 1873. It is also important to note that pretrial detainees "retain at least those constitutional rights that ... are enjoyed by convicted prisoners." *Id.* at 545, 99 S.Ct. at 1877. Thus, conditions and practices in a given institution which would constitute impermissible punishment of convicted prisoners under the less scrutinizing Eighth Amendment would likewise be unconstitutional as applied to pretrial detainees. *See Campbell v. Cauthron*, 623 F.2d 503, 505 (8th Cir. 1980); *Inmates of Allegheny County Jail v. Pierce*, 612 F.2d 754, 762 (3rd Cir.1979).

With these guiding principals in mind, the court will now turn to the application of the Eighth and Fourteenth Amendments to the conditions of confinement in the Knox County Jail.

### C. Application of Standards to the Jail

#### 1. Overcrowding

■ In *Bell v. Wolfish*, the Supreme Court recognized that "confining a given number of people in a given amount of space in such a manner as to cause them to endure genuine privations and hardship over an extended period of time might raise serious questions under the Due Process Clause as to whether these conditions amounted to punishment ..." 441 U.S. at 542, 99 S.Ct. at 1875–76. The constitutional standard on overcrowding cannot be expressed in a square footage formula.

Rather, whether a particular institution is constitutionally overcrowded depends on a number of factors including the size of the inmates' living space, the length of time the inmate spends in his cell each day, the length of time of his incarceration, his opportunity for exercise and his general sanitary and living conditions. *Id.* at 543, 99 S.Ct. at 1876; *Dawson v. Kendrick,* 527 F.Supp. at 1295. In this regard, the Supreme Court has emphasized the length of confinement under allegedly deplorable conditions as being relevant to the analysis of an Eighth Amendment claim. In *Hutto v. Finney,* 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978), *reh. denied,* 439 U.S. 1122, 99 S.Ct. 1035, 59 L.Ed.2d 83 (1979), the Supreme Court noted:

> It is equally plain, however, that the length of confinement cannot be ignored in deciding whether the confinement meets constitutional standards. A filthy, overcrowded cell and a diet of "grue" might be tolerable for a few days and intolerably cruel for weeks or months.

*Id.,* 437 U.S. at 686–87, 98 S.Ct. at 2571.

█ From the proof introduced at trial, the court concludes that the overcrowded conditions at the Jail, and especially in the drunk tank of the Jail, are punitive and violative of the Fourteenth Amendment as applied to pretrial detainees and are violative of the Eighth Amendment as being inadequate shelter when applied to convicted inmates. The recalculated TCI-rated capacity is 228. The credible proof at trial indicates that the inmate population at the Jail has hovered between 260 and 270 for several two to three-month periods during the last two years. As a result, many of the inmates are forced to sleep on the floor of the dayrooms and even on the floor of the drunk tank. Moreover, the court finds that the living conditions in the drunk tank of the Jail are particularly deplorable due to the fact that this part of the facility was designed only to hold up to 12 intoxicated individuals for a short period of time, *i.e.,* 24 to 48 hours; yet, the credible proof at trial indicates that this drunk tank has regularly housed 30 to 50 persons for extended periods of time up to and exceeding one month. The court concludes that these overcrowded conditions at the Jail exhibit the unjustified hardship contemplated in *Wolfish,* as constituting punishment and exceed the minimal line separating cruel and unusual punishment from conduct that is not when applied to the sentenced inmates, *see Cunningham v. Jones,* 567 F.2d at 656, due to the length of time that the inmates are required to endure these conditions and coupled with the fact that there is no fresh air, no opportunity for outdoor exercise, and the fact that the inmates are not always promptly provided basic necessities such as mattresses, sheets and towels, nor are they promptly provided personal hygiene items such as toothpaste, toothbrushes, and toilet paper.[5]

### 2. *Violence*

█ Inmates have the right, secured by the Eighth and Fourteenth Amendments, to be reasonably protected from the threat of violence and sexual assault. *See Woodhous v. Commonwealth of Virginia,* 487 F.2d 889, 890 (4th Cir.1973); *Sweet v. South Carolina Department of Corrections,* 529 F.2d 854, 858 (4th Cir.1975). Moreover, inmates need not wait until they are actually injured by an assault in order to obtain relief from such conditions. *See Trop v. Dulles,* 356 U.S. at 102, 78 S.Ct. at 598–99; *Woodhous,* 487 F.2d at 890; *Di-*

5. The court's ruling at the close of trial on August 15, 1988 limiting the number of inmates in the drunk tank to 16 at any given time should have immediately alleviated these problems with the drunk tank at the Jail. The court would also clarify its oral ruling further at this point to note that it intended to apply this limit to both the drunk tank at the Jail and at the Intake Center and that this order was to be in effect until further written order of the court. Finally, the court recognizes that there will be times when the overall population of the drunk tank will exceed 16 individuals; however, in light of the generally short duration of inmates in the drunk tank, *i.e.,* 24 to 48 hours, as well as the improvement to be realized by the court's elimination of the housing of inmates in the drunk tank, the court does not believe the use of the drunk tank under these circumstances would constitute punishment under the *Wolfish* standard and would not constitute cruel and inhuman treatment to the prisoners since they will no longer be housed there for more than 48 hours.

*marzo v. Cahill,* 575 F.2d 15, 18 (1st Cir. 1978), *cert. denied,* 439 U.S. 927, 99 S.Ct. 312, 58 L.Ed.2d 320 (1978). In evaluating whether the mere threat of violence rises to the level of an Eighth Amendment violation, the *Woodhous* court set forth a two-step analysis to be employed: (1) whether there is a pervasive risk of harm to inmates from other prisoners; and (2) if so, whether the officials are exercising reasonable care to prevent prisoners from intentionally harming others or from creating an unreasonable risk of harm. 487 F.2d at 890.

[14] Even though the mere threat of violence under some circumstances may create a constitutional violation, it is equally important to emphasize that an occasional, isolated attack by one prisoner on another may *not constitute cruel and unusual* punishment. *Id.; Inmates, Washington County Jail v. England,* 516 F.Supp. 132, 140 (E.D.Tenn.1980). However, confinement in a prison where violence and terror reign is actionable, *see Woodhous,* 487 F.2d at 890, even though a pervasive risk of harm may be established by much less than proof of a reign of violence and terror in a particular institution. *Withers v. Levine,* 615 F.2d 158, 161 (4th Cir.1980), *cert. denied,* 449 U.S. 849, 101 S.Ct. 136, 66 L.Ed.2d 59 (1980).

■ In the instant case, the court concludes that there has been a pervasive risk of harm to inmates, whether they be sentenced inmates or pretrial detainees, in the drunk tank when 30 to 50 inmates were regularly being housed therein. It is for that reason, *inter alia,* that the court has already reduced the number of inmates being held in the drunk tank to 16. Moreover, there is credible proof in the record that what was once occasional violence in the rest of the Knox County Jail, *i.e.,* no more than one violent incident per week, has now developed into a pattern of violence, *i.e.,* at least one violent incident a day resulting in two to three inmates per week being taken to the hospital. However, it is still difficult for the court to conclude, as a matter of law, that this level of violence in the Jail (excluding the drunk tank of the Jail) rises to the level of a

constitutional violation of the inmates' rights. In sum, plaintiffs have not proven by a preponderance of the evidence that there is an atmosphere of violence at the Jail. On the other hand, plaintiffs did prevail on this issue with regard to the condition of the drunk tank at the Jail and this was one basis for the court's issuing an immediate order to limit the number of individuals in the drunk tank to 16. It is also the basis upon which this court will no longer tolerate the housing of any inmates for more than two days in this drunk tank.

■ In addition to increasing the incidents of violence in the Jail and, in particular, the drunk tank, the overcrowded conditions have also resulted in a breakdown of an effective classification system in the Jail. It is well settled that courts have ordered prison administrators to institute, at the very least, minimal classification systems which separate inmates by "age, offense, physical aggressiveness, or other criteria which would warrant separate housing arrangements." *Laaman v. Helgemoe,* 437 F.Supp. 269, 319 (D.N.H.1977) (quoting *Goldsby v. Carnes,* 365 F.Supp. 395, 402 (W.D.Mo.1973)). Thus, the court concludes, as a matter of law, that the Jail must either reinstitute its former classification system (assuming it meets constitutional standards) or establish a new one. Regardless of what classification system is utilized, the court would note that it will not tolerate the continuing breakdown of that classification system because of the overcrowded conditions. Accordingly, the court will hear proof as to the type of classification system to be employed.

3. *Sanitation and Ventilation*

■ The provision of basic cleaning supplies such as mops, brooms, toilet brushes, and cleaners are a basic necessity of civilized life. *See Dawson v. Kendrick,* 527 F.Supp. 1252, 1289 (S.D.W.Va.1981); *see also Jones v. Metzger,* 456 F.2d 854, 855 (6th Cir.1972).

In the instant case, the proof at trial indicates the ready availability of all necessary cleaning supplies for use by the inmates. There was proof, however, that

because of the overcrowded conditions at the Jail, it was often difficult to move inmates from one cell to another in order to properly utilize these cleaning materials. Thus, once the overcrowded conditions are eliminated, the court concludes that the inmates and the trustees will be able to properly use the available cleaning materials.

■ Likewise, functioning sinks, toilets and showers are basic necessities of modern life, particularly within the confines of a wholly self-contained environment such as a jail. *See, e.g., Dawson v. Kendrick,* 527 F.Supp. at 1287. Plumbing which is so inadequate and in such a state of disrepair as to constitute a serious threat to the physical and mental wellbeing of prisoners has therefore been condemned as violative of the Eighth Amendment in a variety of contexts. *Id.*

■ In the instant case, there was no credible evidence that there is a lack of functioning plumbing, including toilets, sinks and showers, at any location in the Jail except for the drunk tank. The court concludes that there has been a continuing problem with two of the three toilets in the drunk tank, which is even more deplorable when one considers the number of prisoners that have been housed in that drunk tank in the past. Because of this problem, the sanitary conditions in the drunk tank of the Knox County Jail have been constitutionally impermissible and they will continue to be so until all of the toilets are fully functional. Accordingly, the court will hear proof as to how this situation will be remedied.

■ The failure to regularly provide prisoners with clean bedding, towels, clothing and sanitary mattresses, as well as toilet articles including soap, razors, combs, toothpaste, toilet paper, access to a mirror, and sanitary napkins for female prisoners constitutes a denial of personal hygiene and sanitary living conditions. *See, e.g., Dawson v. Kendrick,* 527 F.Supp. at 1288–89.

■ In the instant case, the court concludes that there have been occasional inci-

dents in which the Jail has run out of some of the above items, often times for several days. This has been especially true with regard to the drunk tank in the Jail. The court concludes therefore that this condition, to the extent that it has occurred, is violative of both the Eighth and Fourteenth Amendments. Accordingly, the court will hear proof as to how these occasional incidents can be further reduced, if not completely eliminated.

### 4. Meals

■ It is well settled that failure to provide inmates with meals sufficient to maintain normal health may constitute a violation of the Eighth or Fourteenth Amendments. *Cunningham v. Jones,* 567 F.2d 653, 655–60 (6th Cir.1977).

■ In the instant case, there was no credible evidence presented which would demonstrate that the meals served at the Knox County Jail were inadequate to support normal human health. The court concludes that there is no constitutional violation in this area as to either sub-class of plaintiffs.

### 5. Exercise and Recreation

■ Prisoners must be afforded sufficient opportunity for physical exercise to maintain proper health. *Grubbs v. Bradley,* 552 F.Supp. 1052, 1130 (citing *Spain v. Procunier,* 600 F.2d 189, 199 (9th Cir. 1979)). Likewise, undue restrictions on prisoners' opportunities for physical exercise may constitute cruel and unusual punishment in violation of the Eighth Amendment when they pose an unreasonable threat to the prisoners' physical and mental health. *Dawson v. Kendrick,* 527 F.Supp. at 1298.

■ In the instant case, because the Jail is designed as a short-term holding facility, *i.e.,* for holding inmates for one year or less, it does not offer outside space for recreation or exercise because proper security cannot be maintained. It is uncontradicted that a lack of exercise can impair the health of both convicted prisoners and pretrial detainees.

Federal courts have varied in their approach to the problem of indoor exercise versus outdoor exercise. For example, the Fifth Circuit has held that pretrial detainees who are not security risks and who had not violated jail disciplinary rules had a right to regular access to outdoor recreation, *Miller v. Carson*, 563 F.2d 741 (5th Cir.1977), but it has also held that one hour of indoor exercise per day is adequate for a maximum security prisoner. *Wilkerson v. Maggio*, 703 F.2d 909 (5th Cir.1983). Some courts have held unequivocally that the lack of opportunity for regular outdoor recreation violates the Eighth Amendment. *See, e.g., Ahrens v. Thomas*, 434 F.Supp. 873 (W.D. No. 1977); *Sinclair v. Henderson*, 331 F.Supp. 1123 (E.D.La. 1971); *see also, Jackson v. Gardner*, 639 F.Supp. 1005, 1011 (E.D.Tenn.1986). Some courts have found that a denial of fresh air and exercise is unconstitutional only for prisoners confined for a period of years. *See Spain v. Procunier*, 600 F.2d at 199; *Sweet v. South Carolina Department of Corrections*, 529 F.2d at 866.

In the instant case, the proof indicates that most of the inmates spend seven hours per day in their cells with access to a dayroom for the remaining 17 hours. The dayrooms are not equipped with recreational equipment (except for inmates who fill garbage bags with water and place them in pillow cases to "pump water"), nor do the defendants otherwise encourage exercise. Only if the floors of the dayroom are free from mattresses do the inmates have any opportunity to perform sit-ups and push-ups. All too often, however, the floors of the dayrooms are used to house inmates because of overcrowded conditions. In short, the problem of exercise is inextricably tied to the problem of overcrowding; if the Jail were not so crowded, then perhaps it would be reasonable to expect prisoners to exercise on the floors of the dayrooms.

■ Although the court finds that the provision for some exercise is constitutionally required, this court is not of the opinion that the opportunity for outdoor exercise is constitutionally required unless the inmates are required to spend more than a year in the Jail. If so, then the defendants must make arrangements not only for exercise but also for regular outdoor exercise.

Therefore, the court concludes that the lack of provision for any meaningful exercise by the inmates at the Jail violates both the Eighth and Fourteenth Amendments. Accordingly, the court will hear proof regarding the feasibility of alleviating the overcrowding to the extent that the floors of the dayrooms can be used for exercise on a regular basis and the feasibility of exercise programs and/or equipment. In the event inmates are to be incarcerated for periods of time exceeding one year, the court will hear proof as to the feasibility of outdoor exercise. Furthermore, defendants are specifically directed to address the duration and frequency with which such exercise can be made available for all inmates.

### 6. Medical and Dental Services

■ In Eighth Amendment cases, a jail's obligation to provide for the medical needs of inmates is measured by the standard enunciated in *Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) of "deliberate indifference to the serious medical needs of prisoners." *Id.*, 429 U.S. at 104, 97 S.Ct. at 291. Likewise, failure to provide needed medical care could result in "genuine privation", thereby amounting to punishment of pretrial detainees in violation of the Fourteenth Amendment. *Bell v. Wolfish*, 441 U.S. at 542, 99 S.Ct. at 1876. The *Estelle* standard has also been applied to systemic deficiencies in the provision of medical care in prisons. Thus, systemic deficiencies manifested by insufficient or unqualified medical personnel and inadequate medical physicals and procedures in a prison which make unnecessary suffering inevitable may constitute an unconstitutional deprivation. *Dawson v. Kendrick*, 527 F.Supp. at 1307.

■ In the instant case, the court concludes that the personnel at the Jail have devised a system whereby the medical needs of the prisoners are treated promptly. Although no physician is on call 24 hours a day, all of the testimony before the

court indicates that inmates are taken immediately to hospitals in the event of a medical need or emergency. Moreover, the proof indicates that three nurses are on duty at the Jail and that one nurse is on call 24 hours a day. Additionally, a physician visits the Jail four hours a day, four days a week to examine those inmates who have "signed up" on sick call. There are only two areas of concern to the court on this issue. First, there was credible testimony as to problems in the delivery of medication. In particular, the proof indicates that medication has occasionally been delivered to the wrong inmate and that sometimes medical supplies have not been timely delivered to inmates. These problems, like the majority of the problems at the Jail, are inextricably linked to the problem with overcrowding. Thus, the court concludes that once the overcrowding has been alleviated, then problems with untimely and incorrect deliveries will be cured. Second, the court is concerned with the breakdown of the classification system due to overcrowding from which the court can reasonably infer that prisoners who need any medical care at the time of their initial incarceration may not be detected. Because there is no nurse or doctor on duty 24 hours a day, the Jail is without any procedure to screen all prisoners upon initial incarceration, many of whom are intoxicated or drugged, by appropriate medical personnel. Rather, many of these prisoners are only screened by a member of the staff who is untrained in the detection of physical or mental illness and, consequently, unprepared to respond fully and properly. It is generally recognized that prompt medical screening is a medical necessity in pre-trial detention facilities. *Dawson,* 527 F.Supp. at 1252.

Therefore, the court concludes that the only constitutionally impermissible conduct to be found at the Jail regarding medical care is.the lack of adequate medical screening at the time of initial incarceration, especially with regard to pretrial detainees. Accordingly, the court will hear proof as to how this goal can best be accomplished.

■ With regard to dental care, the court concludes that the provision for prompt dental care is occasionally constitutionally deficient, especially for the sentenced inmates. Inmate Maurice Eddy testified that he had an abscessed tooth which was not treated during the 88 days he was in the Jail, even after he was "put on the list". The court concludes that an environment in which an inmate endures a substantial delay before receiving necessary dental treatment is constitutionally deficient under either the Eighth or Fourteenth Amendment. Accordingly, the court will hear proof as to any proposed injunctive relief.

### 7. *Access to a Law Library*

■ The Due Process Clause of the Fourteenth Amendment guarantees every state prisoner a right of access to the courts. *Bounds v. Smith,* 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977). This access to the courts must be "adequate, effective and meaningful." *Id.,* 430 U.S. at 822, 97 S.Ct. at 1495. The critical inquiry on this issue is whether the state has fulfilled its duty to assist inmates "in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law." *Id.,* 430 U.S. at 828, 97 S.Ct. at 1498. It is well settled in this Circuit that *Bounds* has not been expanded to require inmates access to a prison law library. *Walker v. Mintzes,* 771 F.2d 920, 932 (6th Cir.1985). Indeed, it is clear that while the *Bounds* Court viewed adequate law libraries as one constitutionally acceptable method to assure meaningful access to the courts, 430 U.S. at 830, 97 S.Ct. at 1499, that Court also encouraged "local experimentation", for example, the use of paralegal assistance, paraprofessionals, law students, or volunteer attorneys, to accomplish this goal. 430 U.S. at 831–32, 97 S.Ct. at 1499–1500. Additionally, in considering the degree to which officials must take affirmative action to ensure prisoners meaningful access, some courts have been cognizant of the expected length of the prisoner's confinement so that the district court need not

consider those inmates whose confinement is of a very temporary nature or for purposes of transfer to other institutions. *Dawson v. Kendrick,* 527 F.Supp. at 1313 (*citing Cruz v. Hauck,* 627 F.2d 710, 719 (5th Cir.1980)).

■ In the instant case, it is undisputed that there is no written policy regarding the inmates' use of the law library. The present unwritten policy is that if an inmate requests a copy of a specific statute or case, then a detention officer will copy the requested material for that inmate. There was also credible proof that the requested material is not always copied as well as credible proof that if it is copied, it is not done so in a timely manner. Furthermore, it is necessary for an inmate to know specifically what legal material he wants before a detention officer can obtain a copy of it. The obvious problem with that procedure is that if the inmate does not know the statute or case he needs, then he has no available resources to undertake the necessary legal research to locate any such statute or case. The court is especially concerned about the deficiencies of this procedure between the time of an inmate's preliminary hearing and his indictment when he is not represented by counsel. However, the court finds no constitutional violations when inmates have court-appointed counsel to represent them. These inmates have been afforded access to the courts as a matter of law. *Holt v. Pitts,* 702 F.2d 639 (6th Cir.1983) (*per curiam*). Nevertheless, the court concludes that the county defendants' unwritten policy governing use of the law library and their nebulous procedure for copying legal material for prisoners has resulted in occasional violation of some inmates' constitutional rights under both the Eighth and Fourteenth Amendments. Accordingly, the court will hear proof as to how the county defendants can ensure meaningful access to the courts, including any proposed "local experimentation."

### 8. *Cause for the Unconstitutional Conditions*

In developing their proof in keeping with the above findings of fact and conclusions of law, the court would caution the state defendants that they will not be allowed to assert that they are unable to alleviate the unconstitutional conditions because of inadequate funding by the state legislature. *See Pugh v. Locke,* 406 F.Supp. 318, 330 (M.D.Ala.1976). The unconstitutionally overcrowded conditions at the Jail, which is the main reason the court finds the conditions of confinement unconstitutional, is due to the fact that the State has encumbered this local jail, as well as other local jails, with its sentenced inmates. The Tennessee legislature has had ample opportunity to make provisions for the State to meet its constitutional responsibilities in this area and this court will tolerate no further delay in the timely implementation of the minimum constitutional standards which will be determined with specificity in the near future.

### D. *Application of Standards to the Intake Center*

#### 1. *Overcrowding*

■ Applying the legal standards set forth at Section III.C.1., *supra,* the court concludes that the overcrowded conditions at the Intake Center, and especially in the drunk tank of the Intake Center, are punitive and violative of the Fourteenth Amendment as applied to pretrial detainees and are violative of the Eighth Amendment as being inadequate shelter when applied to convicted inmates. The TCI-rated capacity of the Intake Center is 127. The credible proof at trial indicates that the inmate population at the Intake Center has exceeded this capacity on occasion. For example, Grand Jury foreman Catron testified that the facility held 143 inmates on February 2, 1988. Similarly, the TDOC jail census summaries indicated that the Intake Center housed 154 prisoners on May 13, 1988. As a result, many inmates have been forced to sleep on mattresses on the dayroom floor and even on the drunk tank floor. Like the drunk tank at the Jail, the court finds that the living conditions in the drunk tank at the Intake Center are particularly deplorable due to the fact that this part of the

facility was designed only to hold up to 16 intoxicated individuals for a short period of time, *i.e.*, 24 to 48 hours; yet, the credible proof at trial indicates that this drunk tank not only has regularly housed many more inmates than its rated capacity but also has housed them for several weeks at a time. The court concludes that these overcrowded conditions at the Intake Center exhibit the unjustified hardship contemplated in *Wolfish* as constituting punishment and exceed the minimal line separating cruel and unusual punishment from conduct that is not when applied to the sentenced inmates, *see Cunningham v. Jones*, 567 F.2d at 656, due to the length of time that the inmates are required to endure these conditions combined with the court's findings that there is no fresh air or opportunity for outdoor exercise. Moreover, inmates are not always promptly provided basic necessities such as mattresses, sheets and towels, nor are they promptly provided personal hygiene items such as toothpaste, toothbrushes, and toilet paper.

### 2. Violence

■ Applying the legal standards set forth in Section III.C.2., *supra*, the court concludes that there has been a pervasive risk of harm to inmates, whether they be sentenced inmates or pretrial detainees, in the drunk tank when more than 16 are regularly being housed therein. It is for that reason, *inter alia*, that the court has already reduced the number of inmates being held in this drunk tank to 16 (just as it has likewise reduced the number of inmates held in the drunk tank of the Jail). However, the court is reluctant to conclude, as a matter of law, that the level of violence in the Intake Center (excluding the drunk tank of the Intake Center) rises to the level of a constitutional violation of the inmates' rights. In arriving at this conclusion, the court has carefully considered the testimony of Mike Mahoney, one of defendants' expert witnesses, who testified that there has been a higher percentage of violence at the Intake Center than at the other two facilities. In short, plaintiffs have not proven by a preponderance of the evidence that there is an atmosphere of violence at

the Intake Center. Nevertheless, as was the case with the Jail, plaintiffs did prevail on this issue with regard to the violence or the potential for violence in the drunk tank at the Intake Center, and this was one basis for the court's issuing an immediate order to limit the number of individuals in the drunk tank to 16. It is also the basis upon which this court will no longer tolerate the housing of any inmates for more than two days in this drunk tank.

■ The court further concludes that the overcrowded conditions at the Intake Center have also resulted in a breakdown of an effective classification system. Under the legal standards set forth at Section III.C.2., the court concludes, as a matter of law, that the Intake Center must either reinstitute its former classification (assuming it meets constitutional standards) or establish a new one. Accordingly, the court will hear proof as to the type of classification system to be employed.

### 3. Sanitation and Ventilation

■ Applying the legal standards set forth in Section III.C.3., *supra*, the court concludes that there have been occasional incidents in which the Intake Center has run out of such necessities as blankets, sheets and towels during times of serious overcrowding, especially with regard to the drunk tank in the Intake Center. The court further concludes that this condition, to the extent that it has occurred, is violative of both the Eighth and Fourteenth Amendments. Accordingly, the court will hear proof as to how these occasional incidents can be further reduced, if not completely eliminated.

■ The court also concludes that the Intake Center's lack of adequate ventilation is constitutionally impermissible under either the Eighth or Fourteenth Amendments. Accordingly, the court will hear proof as to how the ventilation system at the Intake Center can be improved.

### 4. Meals

■ Applying the legal standards set forth in Section III.C.4., *supra*, the court

concludes that there is no constitutional violation in this area as to either sub-class of plaintiffs since there was no credible evidence presented which would demonstrate that the meals served at the Intake Center were inadequate to support normal human health.

### 5. *Exercise and Recreation*

■■■ The court's factual findings regarding the Intake Center were virtually the same as they were for the Jail, except for the fact that the ventilation at the Intake Center is much worse. Therefore, applying the legal standards set forth in Section III.C.5., *supra,* the court concludes that the lack of provision for any meaningful exercise by the inmates at the Intake Center violates both the Eighth and Fourteenth Amendments. Accordingly, the court will hear proof as outlined specifically in Section III.C.5., *supra,* regarding the Intake Center.

### 6. *Medical and Dental Services*

■■■ Applying the legal standards set forth in Section III.C.6., *supra,* the court concludes that the only constitutionally impermissible conduct regarding dental or medical care is the lack of adequate medical screening at the time of initial incarceration, especially with regard to pretrial detainees. Accordingly, the court will hear proof as to how this goal can best be accomplished.

### 7. *Access to a Law Library*

■■■ Although it is undisputed that there is no access to a law library at the Intake Center, plaintiffs introduced no proof regarding any lack of access to the courts. Since the lack of access to a law library is not a *per se* constitutional violation of the inmates' rights under either the Eighth or Fourteenth Amendments, *see Walker v. Mintzes,* 771 F.2d at 932, the court concludes that the plaintiffs have not proven a violation of their constitutional rights under either the Eighth or Fourteenth Amendments on this theory.

### E. *Application of Standards to the Annex*

In light of the court's findings of fact regarding the conditions of confinement at the Annex, the court concludes that there are no constitutionally impermissible conditions which violate either the Eighth or Fourteenth Amendments at the Annex.

Order accordingly.