Alford Lee CUNNINGHAM,
Plaintiff-Appellant,

v.

Russell JONES, Jailer, et al.,
Defendants-Appellees.

No. 76–2659.

United States Court of Appeals,
Sixth Circuit.

Submitted April 20, 1977.

Decided Dec. 6, 1977.

Joseph G. Glass, Louisville, Ky., for plaintiff-appellant.

Albert Jones, Commonwealth's Atty., Second Judicial District of Kentucky, Paducah, Ky., for defendants-appellees.

Before EDWARDS, PECK and ENGEL, Circuit Judges.

EDWARDS, Circuit Judge.

Appellant Cunningham appeals after dismissal of his complaint, filed under 42 U.S.C. § 1983 (1970),[1] alleging that defendant jailers violated his Eighth Amendment rights by subjecting him to cruel and unusual punishment. The District Judge, by stipulation of the parties, heard this complaint on the record of two prior state court habeas corpus actions which dealt with the same facts.

While being held for trial in 1967 in the McCracken County jail, Cunningham was placed in solitary confinement after allegedly attempting a jailbreak and stabbing

---

1. Section 1983 provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. 42 U.S.C. § 1983 (1970).

a deputy jailer. His § 1983 action (filed shortly after his release from the Kentucky penal system)[2] asserts:

That the appellees, and each of them, caused the appellant to be deprived of food for four (4) full days, and thereafter allowed him one (1) full meal every third day for approximately sixteen (16) days, which meal consisted of watery soup or boiled potatoes, and was only enough food to barely sustain life.

The District Judge's relevant findings of fact, which are based largely on the testimony of the Defendants, jailers, and which we accept as not clearly erroneous, are as follows:

The Court finds from the evidence that the plaintiff was determined by the defendants to have been involved in an attempted jail break on April 6, 1967. He was charged in McCracken Circuit Court with malicious cutting of the deputy jailer. From the evidence adduced at the habeas corpus proceeding in the McCracken Circuit Court on November 21, 1968, it appears that the plaintiff was placed in solitary in what is known as the "black cat" in the McCracken County Jail from a period of April 6th until April 21st, 1967. He was provided with a steel bunk and a cell with a window, which was kept closed for security reasons.

\* \* \* \* \* \*

The most serious contention made by the plaintiff, and the only one deserving of any extended discussion is that concerning the deprivation of food. The Court finds that the plaintiff was allowed one meal a day from April 10, 1967 to April 21, 1967. This is admitted by all parties. There is a conflict, however, as to whether he was given any food during the period April 6th to April 10th of the applicable year. He and his witnesses, all of whom are convicted felons, testified unequivocally that he received no rations during that period. Russell Jones, the

Jailer, stated that he thought the plaintiff received one meal a day during the period April 6th to April 10th, stating he wasn't positive but he thought that was right. He did testify that Deputy Jailer King was given absolute discretion to determine the number of meals that the plaintiff would receive.

The District Judge concluded:

In the instant case, the Court finds that plaintiff was provided one meal a day for a period of 15 days. The calorie content of that one meal a day is not shown. Interestingly enough, one of plaintiff's witnesses testified that he gained weight during the 15 day period he was subjected to the one meal a day treatment. Under all of the circumstances, the Court is unable to say that the furnishing of one meal a day for a short period of 15 days constitutes cruel and unusual treatment, although the Court certainly does not approve of the practice and would find little reason for not finding it to be a violation of the Eighth Amendment were it continued over a prolonged period of time.

On this reasoning, the District Judge dismissed Appellant's complaint.

It is Appellant's contention on this appeal that the one meal a day program actually found by the District Judge was used as punishment, was cruel and unusual, and hence was violative of the Eighth Amendment. He also contends that this practice was coercive and was successful in compelling his plea of guilty to the offenses with which he had been charged. On this appeal, we consider only the question of Appellant's Eighth Amendment claim.[3]

As indicated above, the District Judge found as a fact that Appellant was given only one meal a day for 15 days in solitary confinement. The evidence in this record also establishes without contradiction that the elimination of two of the three prisoner meals regularly furnished in the jail was

---

2. Kentucky law tolls the otherwise applicable statute of limitations during penal servitude. See Ky.Rev.Stat. § 413.310.

3. The asserted involuntariness of Appellant's guilty plea is not at issue in this § 1983 action, and we make no comment thereon.

punishment for the attempted jailbreak. Appellees, jailers, claim that the one meal given complainant was "the regular noon meal" served all jail inmates. The record also shows that the Appellees, jailers, made no effort to prove that the one meal a day which was furnished was adequate in calorie content to maintain normal health.[4]

The record also shows that Deputy Jailer Hershel King was given absolute authority to control the food given prisoners in solitary.

## THE EIGHTH AMENDMENT

Legal prohibition of cruel and unusual punishment is an important aspect of humanity's search for civilization. It originated in the English Declaration of Right of 1688 and was designed to prohibit such practices as execution by hanging, drawing and quartering, burning at the stake, the rack and the thumb screw. The standards pertaining to what was cruel and unusual were, of course, quite different from presently accepted ones. But the argument that the Constitution should be read only to prohibit practices found evil by our forefathers has long since been rejected.

In *Weems v. United States,* 217 U.S. 349, 373, 378, 30 S.Ct. 544, 551, 54 L.Ed. 793 (1910), the Supreme Court said:

Legislation, both statutory and constitutional, is enacted, it is true, from an experience of evils, but its general language should not, therefore, be necessarily confined to the form that evil had theretofore taken. Time works changes, brings into existence new conditions and purposes. Therefore a principle to be vital must be capable of wider application than the mischief which gave it birth. This is peculiarly true of constitutions. They are not ephemeral enactments, designed to meet passing occasions. They are, to use the words of Chief Justice Marshall, "designed to approach immor-

tality as nearly as human institutions can approach it." The future is their care and provision for events of good and bad tendencies of which no prophecy can be made. In the application of a constitution, therefore, our contemplation cannot be only of what has been but of what may be. Under any other rule a constitution would indeed be as easy of application as it would be deficient in efficacy and power. Its general principles would have little value and be converted by precedent into impotent and lifeless formulas. Rights declared in words might be lost in reality. And this has been recognized. The meaning and vitality of the Constitution have developed against narrow and restrictive construction.

\*    \*    \*    \*    \*    \*

The [cruel and unusual punishment] clause of the Constitution in the opinion of the learned commentators may be therefore progressive, and is not fastened to the obsolete but may acquire meaning as public opinion becomes enlightened by a humane justice. See *Ex parte Wilson,* 114 U.S. 417, 427 [5 S.Ct. 935, 29 L.Ed. 89]; *Mackin v. United States,* 117 U.S. 348, 350, [6 S.Ct. 777, 29 L.Ed. 909].

This interpretation of the expansive role of the Eighth Amendment has been cited or repeated frequently in Supreme Court opinions. *Trop v. Dulles,* 356 U.S. 86, 78 S.Ct. 590, 2 L.Ed.2d 596 (1958); *Gregg v. Georgia,* 428 U.S. 153, 172–73, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) (joint opinion of Stewart, Powell, and Stevens, JJ.); *Estelle v. Gamble,* 429 U.S. 97, 102, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976).

In *Trop v. Dulles, supra* at 101, 78 S.Ct. at 598, the Supreme Court, citing *Weems, supra,* held: "The Amendment must draw its meaning from the evolving standards of decency that mark the progress of a maturing society."

---

4. Appellant and two fellow prisoners testified that they had been denied all food for four days after the attempted jailbreak and thereafter had been given no more than one meal a day for the 15 days of solitary confinement. One of the prisoners testified that he lost 27 pounds during the 15 days while, as the District Judge noted, another testified he had gained two pounds, although he was hungry.

In *Gregg v. Georgia, supra* at 173, 96 S.Ct. at 2925, the Court held repugnant to the Eighth Amendment punishments which "involve the unnecessary and wanton infliction of pain."

Even more recently the Supreme Court has held:

We therefore conclude that deliberate indifference to serious medical needs of prisoners constitutes the "unnecessary and wanton infliction of pain," *Gregg v. Georgia, supra,* at 173 [, 96 S.Ct. 2909 at 2925] (joint opinion), proscribed by the Eighth Amendment. This is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed. Regardless of how evidenced, deliberate indifference to a prisoner's serious illness or injury states a cause of action under § 1983.

*Estelle v. Gamble, supra,* 429 U.S. at 104–05, 97 S.Ct. at 291 (footnotes omitted).

No Supreme Court case has to date dealt with the precise question we face here, but a number of courts have held that deliberate and unnecessary withholding of food essential to normal health can violate the Eighth Amendment. In a case which grew out of a riot situation in the Kansas State Penitentiary, the Tenth Circuit reversed the dismissal of a § 1983 complaint alleging that prison officials violated the Eighth Amendment when they refused to provide complainant with food for 50½ hours. *Dearman v. Woodson,* 429 F.2d 1288 (10th Cir. 1970).

In *Gates v. Collier,* 349 F.Supp. 881 (N.D. Miss.1972), *aff'd,* 501 F.2d 1291 (5th Cir. 1974), the District Court found many unconstitutional practices at Mississippi's Parchman Penitentiary. Its remedial order provided in relation to inmates placed in segregation that they "shall receive the same daily ration of food which is provided to the general prison population, and in no event shall such inmates receive less than 2000 calories per day." 349 F.Supp. at 900.

The Eighth Circuit remanded to the District Court an order determining that its continued exercise of jurisdiction over the Arkansas prison system was no longer necessary. The opinion of the Court of Appeals concerned itself with the restricted diet provided prisoners placed in solitary confinement. It held:

In the punitive wing, we note the prisoners are denied the regular prison diet. "Grue" is the term applied to the tasteless, unappetizing paste-like food which is served to prisoners in solitary confinement as a form of further punishment. In *Holt I* [*Holt v. Sarver,* 300 F.Supp. 825 (E.D.Ark.1969)], the district court found that grue constituted a nutritionally sufficient diet. 300 F.Supp. at 832. The procedure followed by prison authorities when an inmate is placed on grue, however, makes that conclusion dubious. The prisoner receives one full meal at least every three days and six consecutive full meals every 14 days. At the end of that period, he is given a thorough physical examination. If medical reasons dictate a regular diet then it is ordered. Otherwise the prisoner is continued on this punitive treatment. This, in itself, indicates an awareness of possible dietary insufficiencies. There exists a fundamental difference between depriving a prisoner of privileges he may enjoy and depriving him of the basic necessities of human existence. We think this is the minimal line separating cruel and unusual punishment from conduct that is not. On remand, the district court's decree should be amended to ensure that prisoners placed in punitive solitary confinement are not deprived of basic necessities including light, heat, ventilation, sanitation, clothing and a proper diet.

*Finney v. Arkansas Board of Correction,* 505 F.2d 194, 207–08 (8th Cir. 1974) (footnote omitted).

In a case involving review of many practices found to be violative of the Eighth Amendment in the Virginia Correctional System, Judge Merhige analyzed the reasons why a bread and water diet violated the Eighth Amendment:

Although most of the administrators who testified in this case stated that the imposition of a bread and water diet is now extremely rare, the issue is not moot nor unsuitable for injunctive relief. The director still retains the power to approve bread and water, and in the past he has done so on application by subordinates. Moreover, subordinates have on their own initiative used the practice without approval in the past.

Bread and water provides a daily intake of only 700 calories, whereas sedentary men on the average need 2000 calories or more to maintain continued health. Evidence is not presented on the other nutritional shortcomings of a bread diet, but it does no violence to doctrine of judicial notice to remark that vitamin, protein, and mineral content is probably deficient as well. The purpose and intended effect of such a diet is to discipline a recalcitrant by debilitating him physically. Without food, his strength and mental alertness begin to decline immediately. It is a telling reminder too that prison authorities enjoy complete control over all sources of pleasure, comfort, and basic needs. Moreover, the pains of hunger constitute a dull, prolonged sort of corporal punishment. That marked physical effects ensue is evident from the numerous instances of substantial weight loss during solitary confinement.

Even the Superintendent of the Virginia State Farm, one of whose foremost concerns, and rightly so, must be the safe confinement of dangerous men, has not found it necessary to use bread and water in his memory. Other officials report a very rare use of the tactic. A current manual on prison practices strongly disapproves any disciplinary diet which impairs health. American Correctional Association, Manual of Correctional Standards (hereinafter A.C.A. Manual), 417 (1966).

The practice is therefore both generally disapproved and obsolescent even within this penal system. It is not seriously defended as essential to security. It amounts therefore to an unnecessary infliction of pain. Furthermore, as a technique designed to break a man's spirit not just by denial of physical comforts but of necessities, to the end that his powers of resistance diminish, the bread and water diet is inconsistent with current minimum standards of respect for human dignity. The Court has no difficulty in determining that it is a violation of the eighth amendment. *Jackson v. Bishop*, 404 F.2d 571 (8th Cir. 1968); *Wright v. McMann*, 321 F.Supp. 127 (N.D.N.Y.1970).

*Landman v. Royster*, 333 F.Supp. 621, 647 (E.D.Va.1971).

*See also Murphy v. Wheaton*, 381 F.Supp. 1252 (N.D.Ill.1974), and *Collins v. Schoonfield*, 344 F.Supp. 257 (D.Md.1972). *But see Novak v. Beto*, 453 F.2d 661 (5th Cir. 1971), *rehearing denied en banc*, 456 F.2d 1303 (5th Cir.), *cert. denied*, 409 U.S. 968, 93 S.Ct. 279, 34 L.Ed.2d 233 (1972), and *Ford v. Board of Managers of the New Jersey State Prison*, 407 F.2d 937 (3d Cir. 1969).

With all of this said, the cases which apply most strongly are two Eighth Amendment cases, one of which concerns lack of adequate medical treatment for a prisoner and the other the administration of punishment by Arkansas prison authorities by beating prisoners with a leather strap. It is more the reasoning of these two cases which persuades us than the similarity of the practices to that complained of in our instant case.

We have previously quoted the holding of *Estelle v. Gamble, supra.* But the reasoning supplied by Mr. Justice Marshall's opinion is certainly not limited by its terms to the medical treatment problem with which he was dealing:

The history of the constitutional prohibition of "cruel and unusual punishments" has been recounted at length in prior opinions of the Court and need not be repeated here. See, *e. g., Gregg v. Georgia*, 428 U.S. 153, 169–173 [96 S.Ct. 2903, 2909, 49 L.Ed.2d 859] (1976) (joint opinion of Stewart, Powell, and Stevens, JJ. (hereinafter joint opinion)); see also Granucci, Nor Cruel and Unusual Punish-

ment Inflicted: The Original Meaning, 57 Calif.L.Rev. 839 (1969). It suffices to note that the primary concern of the drafters was to proscribe "torture[s]" and other "barbar[ous]" methods of punishment. *Id.,* at 842. Accordingly, this Court first applied the Eighth Amendment by comparing challenged methods of execution to concededly inhuman techniques of punishment. See *Wilkerson v. Utah,* 99 U.S. 130, 136 [25 L.Ed. 345] (1878) ("[I]t is safe to affirm that punishments of torture . . . and all others in the same line of unnecessary cruelty, are forbidden by that amendment . ."); *In re Kemmler,* 136 U.S. 436, 447 [10 S.Ct. 930, 933, 34 L.Ed. 519] (1890) ("Punishments are cruel when they involve torture or a lingering death . . .").

Our more recent cases, however, have held that the Amendment proscribes more than physically barbarous punishments. See, *e. g., Gregg v. Georgia, supra* [428 U.S.] at 171 [96 S.Ct. at 2924] (joint opinion); *Trop v. Dulles,* 356 U.S. 86, 100–101 [78 S.Ct. 590, 597, 598, 2 L.Ed.2d 596] (1958); *Weems v. United States,* 217 U.S. 349, 373 [30 S.Ct. 544, 551, 54 L.Ed. 793] (1910). The Amendment embodies "broad and idealistic concepts of dignity, civilized standards, humanity, and decency . . . ," *Jackson v. Bishop,* 404 F.2d 571, 579 (CA8 1968), against which we must evaluate penal measures. Thus, we have held repugnant to the Eighth Amendment punishments which are incompatible with "the evolving standards of decency that mark the progress of a maturing society," *Trop v. Dulles, supra* [356 U.S.] at 101 [78 S.Ct. at 598]; see also *Gregg v. Georgia, supra,* [428 U.S.] at 172–173 [96 S.Ct. at 2925] (joint opinion); *Weems v. United States, supra* [217 U.S.] at 378 [30 S.Ct. at 553], or which "involve the unnecessary and wanton infliction of pain," *Gregg v. Georgia, supra* [428 U.S.] at 173 [96 S.Ct. at 2925] (joint opinion); see also *Louisiana ex rel. Francis v. Resweber,* 329 U.S. 459, 463 [67 S.Ct. 374, 376, 91 L.Ed. 422] (1947); *Wilkerson v. Utah, supra* [99 U.S.] at 136.

These elementary principles establish the government's obligation to provide medical care for those whom it is punishing by incarceration. An inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met. In the worst cases, such a failure may actually produce physical "torture or a lingering death," *In re Kemmler, supra,* the evils of most immediate concern to the drafters of the Amendment. In less serious cases, denial of medical care may result in pain and suffering which no one suggests would serve any penological purpose. Cf. *Gregg v. Georgia, supra* [428 U.S.] at 182–183 [96 S.Ct. at 2924–25] (joint opinion). The infliction of such unnecessary suffering is inconsistent with contemporary standards of decency as manifested in modern legislation codifying the common-law view that "[i]t is but just that the public be required to care for the prisoner, who cannot, by reason of the deprivation of his liberty, care for himself."

*Estelle v. Gamble, supra,* 429 U.S. at 102–04, 97 S.Ct. at 290–91 (footnotes omitted).

This leads, then, to the last case upon which we rely. Mr. Justice Blackmun (then a judge of the Eighth Circuit) drafted an opinion for that court which has since been much quoted in Eighth Amendment cases. In holding that an Arkansas prison practice of beating prisoners with a leather strap was cruel and unusual punishment, Justice Blackmun said:

[W]e have no difficulty in reaching the conclusion that the use of the strap in the penitentiaries of Arkansas is punishment which, in this last third of the 20th century, runs afoul of the Eighth Amendment; that the strap's use, irrespective of any precautionary conditions which may be imposed, offends contemporary concepts of decency and human dignity and precepts of civilization which we profess to possess; and that it also violates those standards of good conscience and fundamental fairness enunciated by this court in the *Carey* and *Lee* cases. [*Carey v.*

*Settle,* 351 F.2d 483 (8th Cir. 1965); *Lee v. Tahash,* 352 F.2d 970 (8th Cir. 1965).]

Our reasons for this conclusion include the following: (1) We are not convinced that any rule or regulation as to the use of the strap, however seriously or sincerely conceived and drawn, will successfully prevent abuse. The present record discloses misinterpretation and obvious overnarrow interpretation even of the newly adopted January 1966 rules. (2) Rules in this area seem often to go unobserved. Despite the January 1966 requirement that no inmate was to inflict punishment on another, the record is replete with instances where this very thing took place. (3) Regulations are easily circumvented. Although it was a long-standing requirement that a whipping was to be administered only when the prisoner was fully clothed, this record discloses instances of whippings upon the bare buttocks, and with consequent injury. (4) Corporal punishment is easily subject to abuse in the hands of the sadistic and the unscrupulous. (5) Where power to punish is granted to persons in lower levels of administrative authority, there is an inherent and natural difficulty in enforcing the limitations of that power. (6) There can be no argument that excessive whipping or an inappropriate manner of whipping or too great frequency of whipping or the use of studded or overlong straps all constitute cruel and unusual punishment. But if whipping were to be authorized, how does one, or any court, ascertain the point which would distinguish the permissible from that which is cruel and unusual? (7) Corporal punishment generates hate toward the keepers who punish and toward the system which permits it. It is degrading to the punisher and to the punished alike. It frustrates correctional and rehabilitative goals. This record cries out with testimony to this effect from the expert penologists, from the inmates and from their keepers. (8) Whipping creates other penological problems and makes adjustment to society more difficult. (9) Public opinion is obviously adverse. Counsel concede that only two states still permit the use of the strap. Thus almost uniformly has it been abolished. It has been expressly outlawed by statute in a number of states. See for example, N.D.Cent.Code § 12–47–26 (1960); S.D.Code § 13.4715 (1939). And 48 states, including Arkansas, have constitutional provisions against cruel or unusual punishment. Ark.Const. art. 2, § 9.

We are not convinced contrarily by any suggestion that the State needs this tool for disciplinary purposes and is too poor to provide other accepted means of prisoner regulation. Humane considerations and constitutional requirements are not, in this day, to be measured or limited by dollar considerations or by the thickness of the prisoner's clothing.

*Jackson v. Bishop,* 404 F.2d 571, 579–80 (8th Cir. 1968).

Most of what has just been quoted from Justice Blackmun's opinion in relation to the use of whipping as prison punishment could equally well be said about the use of a slow starvation diet. If such a diet were authorized, no prison or jail rules would successfully prevent abuse of the practice. This record also discloses testimony that even the one meal a day was not furnished on some days. The complete control of the food of the prisoners in solitary was placed in the power of a deputy jailer. Such power, should it fall into the hands of "the sadistic and unscrupulous," could readily be subject to abuse. The imposition of hunger as punishment would tend equally to make those subjected to it hate their jailers and create more difficulties for the institution and for society.

Before seeking to express the limited holding which we believe this case requires, we should make clear what this case does not involve. First, it does not involve any claim that the deprivation of food complained of was due to any administrative problems or caused by any emergency or exigent circumstances. Second, this is not a complaint about the preparation or quality of prison food. Such complaints would generally be far removed from Eighth

Amendment concerns. *See, e. g., Pinkston v. Bensinger,* 359 F.Supp. 95, 99 (N.D.Ill. 1973). Third, it is not purely a "one meal a day case." We recognize that there are many persons who by choice eat one meal a day. Some do so voluntarily to seek to reduce weight brought on by excessive food. Some do so because they enjoy eating at a particular time and at that one meal eat enough to maintain normal health. In contradistinction to these practices, this record involves the forced deprivation of two of the regular three jail meals served each day. The evidence from the jailers is that what Appellant received was the regular noon meal served the rest of the prisoners.

■ The prisoners, of course, could have no access to proofs as to calorie count in the meals actually furnished. Once the evidence established a substantial deprivation of jail food normally served (here a deprivation of two meals a day), the burden of proof as to the adequacy of the one meal actually furnished to maintain normal health must fall upon Defendants since such knowledge is peculiarly within their possession. *See United States v. New York, New Haven & Hartford Railroad Co.,* 355 U.S. 253, 256 n. 5, 78 S.Ct. 212, 2 L.Ed.2d 247 (1957); *United States v. Denver & Rio Grande Railroad Co.,* 191 U.S. 84, 91–92, 24 S.Ct. 33, 48 L.Ed. 106 (1903); *Selma, Rome & Dalton Railroad Co. v. United States,* 139 U.S. 560, 567–68, 11 S.Ct. 638, 35 L.Ed. 266 (1891). *See also Nadeau v. Helgemore,* 423 F.Supp. 1250, 1263–64 (D.N. H.1976).

■ What we cannot ascertain from the record currently presented and the current findings of fact of the District Judge is whether the one meal actually provided the plaintiff was sufficient to maintain normal health. We have held above that the burden of proof on this issue (after the establishment of the deprivation of two-thirds of the daily meals) fell upon Defendants. There is, however, no indication that this burden was defined or understood at the time of the District Court proceeding. We therefore feel compelled to remand for fur-

ther hearing and adjudication of this issue. If the record, as previously stipulated and as augmented by such proofs as the parties may wish to present on remand, convinces the District Judge that the one meal provided was sufficient to maintain normal health, he may again dismiss this complaint. If, on the other hand, the record and proofs then convince him that the withholding of the two meals was such as to deprive the prisoners concerned, including the plaintiff, of sufficient food to maintain normal health, he will reconsider his prior conclusion under the Eighth Amendment precedent cited in this opinion.

The judgment of the District Court is vacated. The case is remanded for further proceedings in accordance with this opinion.

PECK, Circuit Judge, concurring.

I concur in the majority opinion in this case, in which the record clearly establishes that having established a prima facie case the plaintiff-appellant could not procure and offer further essential evidence which was readily available to the defendant-appellee, thereby justifying a shifting of the burden of proof. I would fall short of holding, however, as the majority opinion appears to hold, that the burden of proof automatically shifts as a matter of law on the basis of judicial notice of circumstances pertaining to the essential evidence, e. g., the caloric content of a given diet. It seems to me that such a shift should be predicated upon a showing that the plaintiff has made some attempt to obtain the evidence without success, rather than upon judicial notice of that circumstance.

ENGEL, Circuit Judge, dissenting.

I respectfully dissent. The district court made certain findings which the majority opinion holds are not clearly erroneous. In my opinion these findings preclude our reaching a different result from that of the district court.

While the majority opinion carefully limits its scope and recognizes that the case is "not purely a 'one-meal a day' case," it

seems to me that this is the only meaning which can be attached to the result. This is so because the district court specifically found that another prisoner similarly restricted had gained weight during the period, because the defendant had regular access to counsel during that period and never made a complaint, and because there was no proof that the food served was inadequate in its quality or in minimum quantity. Plaintiff claimed no compensatory damages.

In my opinion the trial court carefully and conscientiously handled the case and demonstrated a proper understanding of the applicable law. Its conclusion that the plaintiff had failed to prove a case of cruel and unusual punishment was within the range of the proofs. I would affirm.