Sean WILLIAMS, Plaintiff,

v.

Thomas A. COUGHLIN III, Donald Selsky, R.J. McClellan, M.L. Hollins, Burge, R.C. Morse, Townley, P. Davis, R. Murphy, L. Joyce, All sued individually and in their official capacities for violations of Plaintiff's Constitutional Rights, Defendants.

No. 92–CV–523C.

United States District Court,
W.D. New York.

Jan. 30, 1995.

Sean Williams, plaintiff pro se.

Dennis C. Vacco, Atty. Gen. of the State of N.Y. (Gail Y. Mitchell, Asst. Atty. Gen., of counsel), Buffalo, NY, for defendants.

CURTIN, District Judge.

This case raises the question of whether, and the extent to which, state prison authorities may constitutionally employ food deprivation as a disciplinary measure.

On August 5, 1992, plaintiff Sean Williams, acting *pro se,* brought suit under the Civil Rights Act, 42 U.S.C. § 1983, against defendants Thomas A. Coughlin, Commissioner of the New York State Department of Correctional Services ("DOCS"), Donald Selsky, Director of the DOCS Special Housing Program, Robert J. McClellan, Superintendent of Southport Correctional Facility ("Southport"), and seven other defendants. Williams alleges that in November 1991, while an inmate at Southport, he was deprived of food for a period of approximately two days, and that as a result he lost consciousness and required medical attention. He claims that thereafter he suffered digestive problems, stomach pains, chest pains, and dizziness. He maintains that the defendants' actions in depriving him of food represented cruel and unusual punishment in violation of the Eighth Amendment, and that imposition of such punishment without a prior hearing denied him due process in violation of the Fourteenth Amendment.

On August 27, 1992, the complaint was dismissed as to defendants Coughlin and Selsky. Item 5. Now before the court are Williams' motion for summary judgment against the remaining eight defendants, Item 26, and the defendants' cross-motions for summary judgment, Items 30 and 33.

The defendants do not deny that Williams was deprived of several meals, or that he lost consciousness and required medical attention as a result of food deprivation. They argue

simply that he violated a prison policy that required certain inmates to return all used food containers and utensils before any new containers or utensils were issued. They contend that his refusal to return a used styrofoam food tray to the corrections officers on duty was deemed a refusal to accept service of his meals. Had he returned the tray, they maintain, he would have been given food. Thus, they argue, his own behavior led to any injury that he might have suffered. Defendants McClellan and Davis also claim that they were not personally involved in the matter.

The facts in this case are very similar to those in *Moss v. Ward,* 450 F.Supp. 591 (W.D.N.Y.1978), in which Judge Elfvin held that the withholding of food from an inmate at the Attica Correctional Facility for a period of four consecutive days was unconstitutionally disproportionate punishment for the inmate's refusal to return a plastic cup to prison guards.

### FACTS

Southport is a Special Housing Unit ("SHU") facility for about 640 prisoners transferred from other New York State prisons due to acts of misconduct considered serious enough to merit punitive segregation in an SHU disciplinary environment for a period of not less than 120 days. Item 29, ¶ 3. All of the inmates at Southport are confined to their cells. Item 31, ¶ 5. At any given time, approximately sixty of the inmates are regarded as presenting chronic disciplinary problems, and are housed in a special area. *Id.* at ¶ 6. In this area, a few of the inmates are held in "shielded" cells with plexiglass cell-front coverings. *Id.* Inmates who have a history of assaulting or reaching out at staff, or of throwing feces,

urine, food, or other substances or objects from their cells, are placed in these shielded cells. *Id.* at ¶ 7 and Ex. 6, p. 20; Item 29, ¶ 6.

All disciplinary SHU prisoners are fed meals in their cells. Item 29, ¶ 5. At Southport, meals are provided three times a day. *Id.* at ¶ 7. Food is delivered to inmates in shielded cells through special food hatches in the fronts of the cells. *Id.* at ¶ 6. For some time prior to late November 1991, the staff at Southport had been experiencing problems with inmates in shielded cells retaining food containers between meals, and using them to collect feces and urine and to throw the stored matter through the food hatches at passing staff. *Id.* at ¶¶ 6–8; Item 31, ¶ 9.[1] To combat this problem, on November 25, 1991, a new procedure was established that required inmates in shielded cells to return, after each meal, all food trays, containers, and utensils that had been given to them. Item 29, ¶¶ 11–12; Item 31, ¶¶ 10–11 and Ex. 1.[2] If an inmate failed to comply, he would be subject to a misbehavior report and deprivation of meals. Item 29, ¶ 13; Item 31, ¶ 11 and Ex. 1.[3]

At the time the new procedure was instituted, Williams was being held in the special area at Southport reserved for inmates with chronic disciplinary problems. Item 29, ¶ 10; Item 31, ¶ 8. He claims, and the defendants have not disputed, that he was placed there because of a shortage of cell space elsewhere in the facility. Item 34, p. 1. He maintains further, and again the defendants have not disputed, that he was not in a shielded cell, and did not have a record of using food containers to throw feces, urine, or other matter at staff or other inmates. Item 26, pp. 2–3; Item 34, p. 1.

1. Certain of the hatches were defective, since they could be opened by inmates from inside the cells. Item 29, ¶ 8.

2. The new procedure was described in a memorandum to all uniformed staff from M. McGinnis, Deputy Superintendent for Security Services at Southport. Item 31, Ex. 1.

3. Apparently, the new procedure was originally instituted on a temporary basis, pending installation of new hatches. *See* Item 31, Ex. 1, p. 1. However, it was evidently later made permanent.

*See, Id., Ex. 6, Southport Correctional Facility, Special Housing Unit—SHU, Staff and Inmate Orientation Manual* (September 1992), pp. 10–11, 20–21. While the November 25, 1991, memorandum stated explicitly that an inmate's refusal to comply would result in deprivation of meals, *Id.,* Ex. 1, p. 2, the September 1992 manual stated that "[i]f you refuse to comply with the above conditions, it will be considered as a refusal to comply with procedures to be fed, therefore refusing your meal." *Id.,* Ex. 6, p. 11.

In the afternoon or early evening of November 26, 1991, Williams refused to return a styrofoam food tray and a cup to defendant Corrections Officer Philip Davis. Item 1, ¶ 19; Item 33, ¶ 4.[4] According to Williams, Davis thereupon walked away from his cell without giving him his evening meal. Item 1, ¶ 19; *see also,* Item 26, p. 1. Davis contends that prison log book entries show that Williams was not denied his evening meal on November 26, 1991. Item 33, ¶ 3. The defendants have placed copies of pertinent pages of the log in the record. Item 31, Ex. 4. Two entries indicate that the meal was served at about 4:10 p.m., and that Davis was collecting trash at 6:00 p.m. An entry evidently made at 6:10 p.m. states that Williams had refused to give up his tray.[5] There is no mention of food being withheld from Williams at that time.

Following Williams' refusal to relinquish his food tray and cup on November 26, 1991, Davis completed an inmate misbehavior report, stating that Williams had failed to comply with two direct orders to throw out the tray, in violation of Rule 106.10.[6] Item 31, Ex. 3; Item 33, ¶ 5. Again, the report gives no indication that Williams was deprived of any meals on November 26, 1991. *See also,* Item 29, ¶ 15.

At about 7:25 a.m. on the following morning, November 27, 1991, Williams again refused to give up his tray, this time to defendant Corrections Officer R. Murphy. Item 29, ¶ 16; Item 31, Exs. 3 and 4. A log book entry marked 7:25 a.m., apparently made by Murphy, states that Williams was not fed at that time, and that he was "deprived of rec/showers this date per [defendant Sergeant] Townley." Item 31, Ex. 4. Like Davis, Murphy completed an inmate misbehavior report, stating that on the morning of November 27, 1991, Williams had twice refused to comply with direct orders to give up his tray, in violation of Rule 106.10. Item 31, Ex. 3. The report continues by stating that

"[a]t this time I did not give him his morning meal," and that "Sgt. Townley was notified of the situation and he deprived inmate Williams of his rec., showers." *Id. See also,* Item 29, ¶ 16. Townley made out a deprivation order, pursuant to 7 N.Y.C.R.R. § 305.2, stating that Williams had been deprived of "exercise, shower," because it had been determined that he was a "[t]hreat to safety of staff. Refused to surrender feed up tray from dinner meal 11/26/91." Item 31, Ex. 2. The order made no mention of deprivation of food.

Williams claims that when Murphy withheld his breakfast on November 27, 1991, he demanded that Murphy give him his meal. Item 1, ¶ 20. He told Murphy that he had no authority to deny him food, and that he was allowed only to "write me a ticket if I refused to comply with your orders." *Id.* Murphy then purportedly told Williams that defendant Lieutenant Burge had ordered him to deprive inmates of meals if they did not comply with "feed-up" procedures. *Id.* Williams thereupon asked Murphy to tell Burge that he would like to speak with him. *Id.*

Shortly thereafter, Burge came to Williams' cell, and informed him of the policy governing the return of food containers and utensils, and of the consequences of failing to comply with that policy. Item 1, ¶ 21; Item 11, ¶ 6. Williams claims that he asked Burge why he was being deprived of his right to an adequate diet, and told him that he had a right to eat, and that prison officials had no right to deprive him of food. Item 1, ¶ 21.

Later that day, Murphy withheld a second meal from Williams. Item 1, ¶ 22; Item 29, ¶ 17; Item 31, Ex. 4. An entry in the prison log, apparently made at 1:10 p.m., states that Williams "refused to give up his tray from 3–11 shift 11–26–91. Inmate was not fed. Sgt. Townley notified. Inmate refused to eat." Item 31, Ex. 4.

---

4. Williams claims that he had retained the tray for storing food between meals, and the cup for drinking water, since breakfast on November 25, 1991. Item 1, ¶ 18, Item 34, p. 2. He maintains that this was an allowed practice engaged in by most SHU inmates at Southport and elsewhere. Item 34, p. 2.

5. Prison records make no mention of the cup that Williams claims to have retained in his cell.

6. DOCS Institutional Rule of Conduct 106.10 (Refusal to Obey a Direct Order). *See* 7 N.Y.C.R.R. § 270.2(B)(7)(i).

In the early afternoon of November 27, 1991, Williams complained to defendant Corrections Counselor L. Joyce that he had been deprived of food. Item 1, ¶ 23; Item 12, ¶ 7. Williams states that he told Joyce that he had not eaten in 24 hours. Item 1, ¶ 23. Joyce admits only that Williams told him that he had not been fed lunch. Item 12, ¶ 7. Joyce agreed to check with security staff about Williams' complaint concerning food deprivation. Item 1, ¶ 23; Item 12, ¶ 7. There is nothing in the record to indicate whether Joyce took any further action.

Williams was deprived of his evening meal on November 27, 1991, but the record does not make clear which officers were involved. Item 1, ¶ 24; Item 29, ¶ 17. The prison log simply contains an entry, made at 5:10 p.m., stating that Williams "refused to give back feed-up tray from earlier meal—inmate was not given a tray at this time." Item 31, Ex. 4. Williams claims that the deprivation was "per order of Lt. Burge ...," Item 1, ¶ 24; however, this is denied by Burge. Item 11, ¶ 4.

On November 28, 1991, breakfast and lunch were withheld from Williams. Item 1, ¶¶ 26, 27; Item 29, ¶ 17. Log entries made by Corrections Officer Murphy again indicate that Williams had failed to comply with feed-up procedures, and that Sergeant Townley had been notified. Item 31, Ex. 4. Again, Williams alleges that he was deprived of these meals by order of Lieutenant Burge, Item 1, ¶¶ 26–27, but Burge denies that he gave any such order. Item 11, ¶¶ 9–10.

At about 2:00 p.m. on November 28, 1991, Williams passed out in his cell and was taken to the prison Health Services Unit for medical attention. Item 1, ¶ 28; Item 29, ¶ 17; Item 31, Ex. 4. The record is not clear as to how long he remained unconscious. Once he regained consciousness, he was given food and medical treatment by medical staff, and was then returned to his cell. Item 1, ¶ 30; Item 29, ¶ 18. Meanwhile, a corrections officer had entered his cell and removed the tray

that he had refused to relinquish. Item 29, ¶ 17; Item 31, Ex. 4. Thereafter, he complied with the procedures governing the return of soiled food containers, and was fed meals in the customary fashion. Item 29, ¶ 18.[7]

Williams asserts that on the evening of November 26, 1991, after he had purportedly been deprived of his evening meal by Officer Davis, he began writing a complaint to the Superintendent of Southport, defendant Robert J. McClellan. Item 1, ¶ 19. He claims that McClellan and two other senior Southport staff defendants, First Deputy Superintendent M.L. Hollins and Captain Richard C. Morse, were made aware that he was not being fed, and that they were all parties to denying him his rights "as stated in their response to my complaint to Superintendent McClellan dated November 27, 1991." *Id.* at ¶ 32. He avers that McClellan "appointed Hollins and Morse to rectify the situation. Situation was not corrected." Item 26, p. 2. Neither Williams' complaint to the prison authorities nor any response that may have been forthcoming has been placed in the record here. Hollins does acknowledge that Williams filed a complaint, which triggered an investigation. Item 29, ¶ 21. He states that according to prison records, Williams was "apprised of the outcome of the investigation into his complaint and deliberately opted not to comply with facility policy. He is, thus, solely responsible for missing meals." *Id.* at ¶ 22. It seems, therefore, that at some time during the period in which Williams was being deprived of food, he lodged a complaint that came to the attention of a prison official in a sufficiently senior position to order a prompt investigation. But it is not clear who that official was. McClellan avers that on November 26–28, 1991, he was on vacation away from Southport. Item 31, ¶ 3. While Hollins acknowledges that a complaint was filed and an investigation took place, he does not indicate

---

**7.** Williams maintains that from November 28, 1991, he began experiencing severe problems with stomach pains and digesting his food. Item 1, ¶ 31. He claims that he complained to the medical staff at Southport, and was given medication. *Id.* At the time he filed his complaint in

this action, he was, he claims, still experiencing digestive problems, stomach pains, chest pains, and dizziness. *Id.* at ¶ 32. Neither Williams nor the defendants have placed any evidence in the record to support or refute these claims.

who ordered, or who conducted, the investigation.

On December 5, 1991, a "Tier III" disciplinary hearing was held, pursuant to 7 N.Y.C.R.R. Part 254, at which Williams was found guilty of refusing to comply with the direct orders of Officer Murphy, on November 27, 1991, as set out in the misbehavior report made out by Murphy. Item 31, ¶¶ 14–15 and Ex. 5. The hearing officer imposed a penalty of 45 days in SHU, and loss of packages, commissary and phones, suspended for 90 days. *Id.,* Ex. 5, transcript of Tier III hearing, p. 9. He also recommended two months' loss of good time. *Id.*

On December 8, 1991, a "Tier II" disciplinary hearing was held, pursuant to 7 N.Y.C.R.R. Part 253, at which Williams pled guilty to refusing to comply with the direct orders of Officer Davis, on November 26, 1991, as set out in the misbehavior report made out by Davis. Item 31, ¶¶ 13–15 and Ex. 5. The hearing officer, defendant Lieutenant Burge, counselled Williams, and issued a warning. *Id.,* Ex. 5, transcript of Tier II hearing, p. 5.

### DISCUSSION

### 1. Summary Judgment Standard

Summary judgment may be granted only if the "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Whether a disputed fact is material can only be determined by reference to the applicable substantive law. *See Heilweil v. Mount Sinai Hospital,* 32 F.3d 718, 721 (2d Cir.1994). The burden is on the moving party to demonstrate that no genuine issue exists with respect to any material fact. *Gallo v. Prudential Residential Services, Limited Partnership,* 22 F.3d 1219, 1223 (2d Cir. 1994). All ambiguities must be resolved and all inferences drawn in favor of the nonmoving party. *Id.* The moving party may prevail by showing that little or no evidence may be found in support of the nonmoving party's case. *Id.* at 1223–24. There is no genuine issue of material fact, and a grant of summary judgment is proper, "[w]hen no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight." *Id.* at 1224. The trial court's task is "limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Id.*

### 2. Eighth Amendment Claim

■ The Eighth Amendment protects prison inmates from " 'cruel and unusual punishments,' " including punishments that " 'involve the unnecessary and wanton infliction of pain.' " *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994) (quoting *Gregg v. Georgia,* 428 U.S. 153, 173, 96 S.Ct. 2909, 2925, 49 L.Ed.2d 859 (1976)). It prohibits "grossly disproportionate" penalties, "as well as those that transgress today's 'broad and idealistic concepts of dignity, civilized standards, humanity, and decency.' " *Hutto v. Finney,* 437 U.S. 678, 685, 98 S.Ct. 2565, 2570, 57 L.Ed.2d 522 (1978) (quoting *Estelle v. Gamble,* 429 U.S. 97, 102, 97 S.Ct. 285, 290, 50 L.Ed.2d 251 (1976)). It is contextual, " 'draw[ing] its meaning from the evolving standards of decency that mark the progress of a maturing society.' " *Hudson v. McMillan,* 503 U.S. 1, ——, 112 S.Ct. 995, 1000, 117 L.Ed.2d 156 (1992) (quoting *Rhodes v. Chapman,* 452 U.S. 337, 346, 101 S.Ct. 2392, 2412, 69 L.Ed.2d 59 (1981)).

■ In addition to prohibiting punishments that involve the unnecessary and wanton infliction of pain, the Eighth Amendment imposes certain duties on prison officials, who "must ensure that inmates receive adequate food, clothing, shelter and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.' " *Farmer v. Brennan,* —— U.S. ——, ——, 114 S.Ct. 1970, 1976, 128 L.Ed.2d 811 (1994) (quoting *Hudson v. Palmer,* 468 U.S. 517, 526–27, 104 S.Ct. 3194, 3200, 82 L.Ed.2d 393 (1984)). As the Supreme Court has observed recently:

"[W]hen the State takes a person into its custody and holds him there against his

will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well being.... The rationale for this principle is simple enough: when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—*e.g.,* food, clothing, shelter, medical care, and reasonable safety—it transgresses the substantive limits on state action set by the Eighth Amendment...." Contemporary standards of decency require no less.

*Helling v. McKinney,* —— U.S. ——, ——, 113 S.Ct. 2475, 2480, 125 L.Ed.2d 22 (1993) (quoting *DeShaney v. Winnebago County Dept. of Social Services,* 489 U.S. 189, 199–200, 109 S.Ct. 998, 1005, 103 L.Ed.2d 249 (1989)). Nevertheless, the Eighth Amendment "does not mandate comfortable prisons." *Rhodes v. Chapman,* 452 U.S. at 349, 101 S.Ct. at 2400. "[O]nly those deprivations denying 'the minimal civilized measure of life's necessities,' ... are sufficiently grave to form the basis of an Eighth Amendment violation." *Wilson v. Seiter,* 501 U.S. 294, 298, 111 S.Ct. 2321, 2324, 115 L.Ed.2d 271 (1991) (quoting *Rhodes v. Chapman,* 452 U.S. at 347, 101 S.Ct. at 2399).

■ To violate the Eighth Amendment, "a prison official must have a 'sufficiently culpable state of mind.'" *Farmer v. Brennan,* —— U.S. at ——, 114 S.Ct. at 1977 (quoting *Wilson v. Seiter,* 501 U.S. at 297, 111 S.Ct. at 2323). In cases concerning prison conditions, "that state of mind is one of 'deliberate indifference' to inmate health and safety." *Id.* More specifically, a prison official "cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health and safety." *Id.* at ——, 114 S.Ct. at 1979; *see also, Hathaway v. Coughlin,* 37 F.3d at 66.

### a. "Sufficiently Serious" Deprivation

In this case, Williams claims that he was deprived of food for a period of about two days. The evidence in the record unequivo-cally establishes, and the defendants do not dispute, that a total of five meals were withheld from him between about 7:00 a.m. on November 27, 1991, and 2:00 p.m. on November 28, 1991. Although Williams asserts that Officer Davis deprived him of his evening meal on November 26, 1991, this claim is entirely unsubstantiated. The prison log indicates that the meal was served at about 4:10 p.m. on November 26, 1991, and that Williams refused to return his tray to Davis at about 6:00 p.m., almost two hours later. There is no mention, either in the prison log or in the misbehavior report completed by Davis on November 26, 1991, that food was withheld from Williams at that time. Nevertheless, it is clear from the record that no food was delivered to Williams from the time that he received his evening meal at about 4:00 p.m. on November 26, 1991, until he passed out in his cell at about 2:00 p.m. on November 28, 1991, almost two full days later.

■ Before considering whether the withholding of five meals over a period of two days is "sufficiently serious" to constitute a deprivation of constitutional dimension, I should address the defendants' argument that Williams' refusal to return his food tray was deemed a refusal to accept service of his meals, and that it was therefore merely his own behavior that led to any injury he might have suffered. *See* Item 29, ¶¶ 16, 19, 22; Item 31, ¶¶ 12, 13. I note, first of all, that this contention is at odds with the documentary evidence on the record. The November 25, 1991, memorandum to all uniformed staff describing the new "feed-up" procedure stated unambiguously that in the event that an inmate refused to return all food containers to prison staff after his meal, he would be "*subject to ... [d]eprivation of meals.*" *Id.,* Ex. 1, p. 2 (emphasis added). There is nothing in the memorandum, or in any of the other contemporaneous documents in the record, to suggest that at that time, Southport officials viewed a failure to comply with the procedure as representing a refusal to accept food. The copy of the Southport Staff and Inmate Orientation Manual placed in the record by the defendants does state that a refusal to comply would be considered a re-

fusal of a meal. *Id.,* Ex. 6, p. 11. But the manual is dated September 1992, ten months after the events at issue here, and it is by no means clear that it provides an accurate statement of the policy in place at Southport in November, 1991. At the least, there is an issue of fact as to whether, in November, 1991, an inmate's failure to comply was deemed by the staff to represent a rejection of food.

More importantly, it is quite clear that whether or not Southport officials deemed Williams' refusal to return his tray as a rejection of food, Williams in fact made it known to the prison staff that he was *not* refusing to accept his meals, and that he strenuously objected to being deprived of them. Regardless of how his behavior may have been characterized, Williams unquestionably wanted food, and prison staff declined to give it to him. It is simply undeniable, and the defendants have not, in fact, attempted to deny, that the prison staff deliberately withheld food from Williams against his wishes, in response to his refusal to comply with an institutional rule. There is absolutely nothing in the record to suggest that he did not actually want to eat.

It is also worth reemphasizing at this point that there is no evidence in the record to suggest that Williams had a history of engaging in the kind of conduct that the Southport staff were attempting to curtail by instituting the new "feed-up" procedure in November 1991. The procedure was designed to reduce the number of incidents of inmates throwing feces, urine, food, and other items from their cells. Williams denies that he had engaged in any such behavior, and the defendants have not disputed this.

I come, then, to the question of whether, under the circumstances of this case, deprivation of five consecutive meals over a period of two days was "sufficiently serious" to support a claim of an Eighth Amendment violation: *i.e.,* whether that level of deprivation was "grossly disproportionate," *Hutto v. Finney,* 437 U.S. at 685, 98 S.Ct. at 2570, or

denied Williams " 'the minimal civilized measure of life's necessities.' " *Wilson v. Seiter,* 501 U.S. at 298, 111 S.Ct. at 2324 (quoting *Rhodes v. Chapman,* 452 U.S. at 347, 101 S.Ct. at 2399). I note, first of all, that there is little Supreme Court or Second Circuit case law providing guidance on the issue. The Supreme Court has indicated that prison inmates may be placed under conditions of confinement that include a *restricted* diet for limited periods of time. *Hutto v. Finney,* 437 U.S. at 686–87, 98 S.Ct. at 2571 ("[a] filthy, overcrowded cell and a diet of 'grue' might be tolerable for a few days and intolerably cruel for weeks or months").[8] But no Supreme Court case has directly faced the questions of whether, under what circumstances, and for how long, prison officials may deliberately withhold *all* food from an inmate.

The Second Circuit has noted that "[w]hile no court has explicitly held that denial of food is a per se violation of a prisoner's Eighth Amendment rights, under certain circumstances a substantial deprivation of food may well be recognized as being of constitutional dimension." *Robles v. Coughlin,* 725 F.2d 12, 15 (2d Cir.1983) (citing *Cunningham v. Jones,* 567 F.2d 653, 659–60 (6th Cir.1977) (dismissal of a complaint alleging inmates were served only one meal a day for 15 days remanded for finding of nutritional adequacy); and *Moss v. Ward,* 450 F.Supp. at 596–97 (deprivation of food for four days held to be unconstitutionally disproportionate punishment for violation of a disciplinary rule essentially identical to the one at issue in the present case)). The *Robles* court found that a complaint alleging that prison officials had withheld food from inmates for 12 days, three of which were consecutive, within a 53 day period, and had also served food contaminated with dust, rocks, glass and human waste, was. sufficient to withstand dismissal. *Id.* at 13, 15–16.

In *Moss v. Ward;* an inmate alleged that he had been deprived of food for four days as

---

**8.** "Grue" is a "substance created by mashing meat, potatoes, oleo, syrup, vegetables, eggs and seasoning into a paste and baking the mixture in a pan." *Hutto v. Finney,* 437 U.S. at 683, 98 S.Ct. at 2569. The inmates in *Hutto* were fed less than 1,000 calories per day, much less than the approximately 2,000 calories per day expended by a mature man spending 12 hours a day lying down and 12 hours a day simply sitting or standing. *Id.*

punishment for refusing to return a plastic cup to prison guards. *Moss v. Ward,* 450 F.Supp. at 593–94. As in the present case, a prison rule requiring the return of food utensils had been promulgated to alleviate the problem of SHU inmates using the utensils to collect urine and feces to throw at guards. *Id.* at 593. Judge Elfvin observed that "[a]lthough being deprived of one or two meals might not be cruel and unusual punishment, prison officials cannot impose such severe sanctions for breaking a disciplinary rule, as occurred in the instant case, on prisoners when there is no showing that the prisoner is engaging in the type of conduct the rule is designed to prevent." *Id.* at 596. He went on to hold that the inmate's Eighth Amendment rights had been violated, noting that the punishment "was grossly disproportionate to the offense and went beyond what was necessary to achieve the state's goals." *Id.* at 596–97.

More recently, in *Hodge v. Ruperto,* 739 F.Supp. 873 (S.D.N.Y.1990), the Southern District of New York held that a pre-arraignment detainee's claim that police officers "deprived him of food and water for two-and-one-half days and confined him in an overcrowded and unsanitary cell charg[ed] conduct sufficiently egregious to allow a reasonable inference of inadequate supervision amounting to deliberate indifference to plaintiff's constitutional rights." *Id.* at 878. Thus, deprivations lasting as short a time as two-and-one-half days have been recognized in this Circuit as being potentially severe enough to sustain a constitutional claim.

One other case, from the Tenth Circuit, is helpful. In *Dearman v. Woodson,* 429 F.2d 1288 (10th Cir.1970), the court found that it could not conclude as a matter of law that deprivation of food for 50½ hours—very little longer than Williams went without food in the present case—was not cruel and unusual punishment. *Id.* at 1290; *see also, Cooper v. Sheriff, Lubbock County, Texas,* 929 F.2d 1078, 1083 (5th Cir.1991) (noting that depriving a prisoner of adequate food is a form of corporal punishment, and citing *Dearman v. Woodson* in holding that an allegation of deprivation of food for 13 days, 12 of which were consecutive, presented a set of facts that might entitle the prisoner to relief). The court observed further that "we think it beyond dispute that a punishment may be cruel and unusual when, although applied in pursuit of legitimate penal aims, it goes beyond what is necessary to achieve those aims." *Id.* Absent information as to the facts and circumstances surrounding the withdrawal of food from the inmate, the court could not decide whether the official actions were reasonable. *Id.* Therefore, the simple allegation that the inmate had been deprived of food for 50½ hours was sufficient to state a cause of action. *Id.*

■ Courts may ·use, *inter alia,* correctional guidelines and standards from a variety of sources to inform themselves of contemporary standards relating to the operation of corrections facilities. *See, e.g., Rhodes v. Chapman,* 452 U.S. at 343, 348, nn. 7, 13, 101 S.Ct. at 2397, 2400, nn. 7, 13; *Estelle v. Gamble,* 429 U.S. at 103 n. 7, 97 S.Ct. at 290; *Lareau v. Manson,* 651 F.2d 96, 106–07 (2d Cir.1981). In this regard, I note that several such documents indicate that current standards require the provision of as many as three meals per day, and disapprove the use of food deprivation as a disciplinary measure. *See, e.g., Manual of Standards for Adult Correctional Institutions,* American Correctional Association (1990), Standard 3–4309 ("[w]ritten policy, procedure and practice require that at least three meals (including two hot meals) are provided at regular meal times during each 24–hour period, with no more than 14 hours between the evening meal and breakfast"); *Standards for Criminal Justice,* American Bar Association (1983), Standard 23–6.13(d) ("[a] prisoner ... placed in a more secure housing unit pursuant to disciplinary ... action ... should not be deprived of ... regular diet"); *Federal Standards for Prisons and Jails,* United States Department of Justice (1980), Standard 4.08 ("[a]t least three meals, two of which are hot meals, are provided at regular meal times during each 24–hour period with no more than 14 hours between the evening meal and breakfast"), Standard 4.09 ("[w]ritten policy and procedure preclude the use of food as a reward or disciplinary measure"), and Standard 11.18 ("[w]ritten policy and procedure require that inmates in disciplinary detention

and administrative segregation receive normal institution meals"); *United Nations Standard Minimum Rules for the Treatment of Prisoners* (1955), Rule 20(1) ("[e]very prisoner shall be provided by the administration *at the usual hours* with food of nutritional value for health and strength ..." (emphasis added)).

■ In view of the above, I have no hesitation in finding that the defendants' motions for summary judgment cannot be granted on the basis that the deprivation suffered by Williams was not sufficiently serious to be of constitutional dimension. There is precedent for finding that the withholding of food from a prisoner for a period of approximately two days may state a claim under the Eighth Amendment. *Dearman v. Woodson,* 429 F.2d at 1290; *see also, Hodge v. Ruperto,* 739 F.Supp. at 878. There is also precedent for finding that the withholding of food is grossly disproportionate punishment for a prisoner's refusal to comply with a rule requiring the return of food containers to prison guards, when, as in the present case, the prisoner has not engaged in the kind of conduct that the rule was designed to prevent. *Moss v. Ward,* 450 F.Supp. at 593–94.[9],[10] Furthermore, several correctional guidelines and standards indicate that contemporary standards require prison authorities to provide regular, daily meals to all prisoners, and they disapprove the use of food deprivation as a disciplinary measure.

At the same time, I am not prepared to hold that Williams must prevail, as a matter of law, on the question of whether the deprivation he suffered was severe enough to support an Eighth Amendment claim. " 'Eighth

Amendment judgments should neither be nor appear to be merely the subjective views' of judges." *Rhodes v. Chapman,* 452 U.S. at 346, 101 S.Ct. at 2399 (quoting *Rummel v. Estelle,* 445 U.S. 263, 275, 100 S.Ct. 1133, 1140, 63 L.Ed.2d 382 (1980)). The parties have not yet developed the record on this issue, and I cannot conclude, at this time, that no rational jury could find in favor of the defendants on the issue of the seriousness of the deprivation.

### b. "Deliberate Indifference"

As noted above, to violate the Eighth Amendment "a prison official must have a 'sufficiently culpable state of mind.' " *Farmer v. Brennan,* —— U.S. at ——, 114 S.Ct. at 1977 (quoting *Wilson v. Seiter,* 501 U.S. at 297, 111 S.Ct. at 2323). In prison conditions cases, the requisite state of mind is one of " 'deliberate indifference' to inmate health or safety." *Id.* (quoting *Wilson v. Seiter,* 501 U.S. at 297, 111 S.Ct. at 2323). Thus, the defendants in this case may prevail on their motions for summary judgment if there is little or no evidence in support of a finding that they acted in a deliberately indifferent fashion. *See Gallo v. Prudential Residential Services, Limited Partnership,* 22 F.3d at 1223–24.[11]

■ In *Farmer,* the Supreme Court held that a prison official "cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official [knew] of and disregard[ed] an excessive risk to inmate health or safety." *Farmer v. Brennan,* —— U.S. at ——, 114 S.Ct. at 1979; *see also,*

---

**9.** I recognize that in *Moss,* the withholding of food lasted for four days, rather than two, as in this case. *Moss v. Ward,* 450 F.Supp. at 593–94. But I find it significant that here, the period of deprivation ended only when Williams passed out and was taken to the Health Services Unit for medical attention. How long the period of deprivation might have continued if Williams had not lost consciousness is not clear. I also find it significant that Williams was subjected not only to deprivation of food as a result of his refusal to relinquish his tray—he was also deprived of exercise and showers, and was given further substantial penalties at the subsequent Tier III disciplinary hearing.

**10.** I note that I do not need to address here the questions of whether, and if so under what circumstances and conditions, and for how long, prison officials may legitimately withhold food from an inmate who *has* engaged in the kind of conduct that the rule at issue in the present case was designed to prevent.

**11.** Since I cannot conclude that Williams must prevail, as a matter of law, on the issue of the seriousness of the deprivation he suffered, it is obviously premature to consider whether or not he may prevail, as a matter of law, against any of the defendants on the question of deliberate indifference.

*Hathaway v. Coughlin,* 37 F.3d at 66. The official must have been both "aware of facts from which the inference could be drawn that a substantial risk of harm exist[ed], and he must [have drawn] the inference." *Id.* Under this standard, a claimant "need not show that a prison official acted or failed to act believing that harm actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." *Id.* at ——, 114 S.Ct. at 1981. Whether the official had the requisite knowledge is "a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence." *Id.* A trier of fact "may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Id.*

█ Applying the standard enunciated in *Farmer,* I find that there is insufficient evidence in the record to sustain Williams' Eighth Amendment claims against two of the defendants in this case, Officer Davis and Counselor Joyce. The only allegation against Davis is that he withheld one meal from Williams on the evening of November 26, 1991. As noted above, this allegation is completely unsubstantiated, and conflicts with the evidence in the record. There is simply nothing in the record to suggest that Davis was aware at any time that Williams was deprived of food.

█ The only allegations concerning Joyce are that in the early afternoon of November 27, 1991, Williams complained to him that he was being deprived of food, and Joyce agreed to discuss the matter with security staff. Williams has not alleged that Joyce was directly involved in depriving him of food, or that he failed to talk to the security staff as he acknowledges he agreed to do, or that he had any obligation to take any further action. The allegations relating to Joyce are simply insufficient to sustain a claim that he exhibited "deliberate indifference" in this case, as is the evidence in the record.

█ I find, however, that given that the withholding of food for two or more days in response to a minor disciplinary infraction may be sufficiently serious to sustain an Eighth Amendment claim, and that the risks of extended periods of food deprivation might well be regarded as obvious, there is sufficient evidence in the record to create a genuine issue of material fact, at the least, as to whether the remaining six defendants acted with deliberate indifference. Officer Murphy personally withheld as many as four meals from Williams between the morning of November 27, 1991, and the afternoon of November 28, 1991. Sergeant Townley, to whom Murphy reported, was notified on each of those occasions, and must have been aware of the length of time that Williams had been deprived of food. He took no steps to intercede.

Superintendent McClellan avers that on November 26–28, 1991, at the time the incidents at issue here took place, he was away from Southport, on vacation. However, the record indicates that a copy of the November 25, 1991, memorandum describing the new "feed-up" policy providing for deprivation of food from inmates was to be sent to him. Item 31, Ex. 1, p. 2. This raises a question of fact as to whether he knew of the policy on or before November 25, 1991, and either approved it or failed to take steps to ensure that no Southport inmate would be deprived of food for an extended period of time.

█ Williams claims that he addressed a written complaint to McClellan on November 27, 1991, and that McClellan appointed First Deputy Superintendent Hollins and Captain Morse to "rectify the situation." Item 26, p. 2. The record indicates that Williams did indeed file a complaint, and that some kind of an investigation took place during the time that food was being withheld from Williams. The investigation failed to result in the provision of food to Williams. While there is insufficient evidence in the record to support a claim that McClellan actually knew that Williams was being deprived of food, neither Hollins nor Morse denies that they were aware of what was taking place, or that they participated in whatever investigation occurred. Hollins states that Williams was "apprised of the outcome of the investigation into his complaint and deliberately opted not to comply with facility policy." Item 29, ¶ 22.

There is enough in the record, therefore, to raise a genuine issue of fact, at least, as to whether Hollins and Morse knew of the deprivation to which Williams was being subjected, and as to whether they acted in an appropriate fashion on the basis of their knowledge.

Williams maintains that he was deprived of meals by order of Lieutenant Burge, a claim that Burge denies. Burge does acknowledge, however, that on the morning of November 27, 1991, after Williams had been deprived of one meal, he came to Williams' cell, and informed him of the new policy governing the return of food containers and of the consequences of failing to comply with the policy. Item 1, ¶ 21; Item 11, ¶ 6. It is therefore apparent that Burge knew that Williams was being subjected to the food-deprivation policy, and that he participated in one way or another in applying the policy to Williams. Again, this raises sufficient questions as to Burge's role to preclude summary judgment.

### 3. Due Process

Williams claims that in depriving him of food without a prior hearing, the defendants denied him due process. Since I find that Williams may continue to litigate his Eighth Amendment claim, and neither Williams nor the defendants have yet briefed the due process issue, I find it premature to consider due process at this time, and decline to rule on that claim for the present.

Nevertheless, I find that since there is insufficient evidence in the record to implicate defendants Davis and Joyce in the withholding of food from Williams, summary judgment may be granted to those two defendants on the due process issue.

### CONCLUSION

For the reasons given above, Williams' motion for summary judgment, Item 26, is denied. The motions of defendants McClellan, Hollins, Morse, Burge, Townley, and Murphy, Item 30, are also denied. Defendant Davis' motions, Items 30 and 33, and defendant Joyce's motion, Item 30, are granted.

So ordered.